OPINION OF THE COURT
Gabrielli, J.
At about 7:15 p.m. on the evening of September 30, 1969, plaintiff William Nallan was shot in the back by an unknown assailant as he leaned over to sign a guest register that had been placed on a desk located in the lobby of a midtown *513 Manhattan office building owned and operated by defendants. It is assumed by all parties that the assailant, who has never been caught, was a would-be assassin whose purpose was to retaliate against Nallan for his efforts to uncover certain corrupt practices in the labor union in which Nallan was an active member. Nallan ultimately recovered from his wounds, and, some time thereafter, he and his wife commenced the instant negligence action against the building owner and manager, seeking recompense for his personal injuries and her loss of services. On this appeal from an order of the Appellate Division, which affirmed a judgment in favor of defendants, the sole question presented is whether the facts adduced at the trial were sufficient to establish a prima facie case of negligence against the two defendants. For the reasons that follow, we conclude that a prima facie case in negligence was made out, and, accordingly, we hold that plaintiffs are entitled to have their complaint reinstated and that a new trial should be had.
At the first trial, plaintiff William Nallan testified that he had been an officer in Theatrical Local 52 of the International Alliance of Theatrical and Stage Employees for several years. In the months preceding the shooting, according to Nallan, he had begun to make inquiries about certain irregularities in the union’s practices which, he suspected, were indicative of internal corruption. Following these inquiries, Nallan received word of two separate incidents, which he interpreted as thinly veiled threats upon his life. These incidents were reported to the police, but no additional information emerged as a result of the police investigation, and, consequently, Nallan apparently assumed that he was no longer in any serious danger.
On the evening of September 30, 1969, Nallan arrived at the Fisk Building located at 250 West 57th Street in Manhattan, where a regular business meeting of the union was scheduled to be held. After entering the building through the front door, Nallan immediately proceeded to the sign-in book which had been placed on a desk in the center of the lobby by the building manager. Ordinarily, an attendant employed by the management was stationed at the desk to sign in individuals who arrived at the building after business hours. On the night in question, however, the lobby attendant was away from his post attending to his janitorial responsibilities elsewhere in the building. Consequently, plaintiff Nallan, who was familiar with the after-hours procedures in the building, decided to *514 sign himself in before proceeding to the union offices, which were located on one of the upper floors. As he bent over the desk to sign his name, Nallan heard what sounded like a gunshot and, immediately thereafter, felt a burning sensation in his back. Several individuals were seen running from the building after the shot was fired, but Nallan’s assailant was never identified or apprehended. As a result of the shooting, Nallan was incapacitated for a number of months and required intensive nursing care.
In their suit against the owner and manager of the Fisk Building, the Nallans relied upon two distinct theories of liability. First, they contended that, by employing an attendant to keep an eye on the building lobby, defendant HelmsleySpear had, in effect, assumed an obligation to provide at least minimal protection from criminal intruders for visitors who entered the building after business hours. The lobby attendant’s absence from his assigned post, according to plaintiffs, represented a lack of due care in the performance of this assumed obligation. Hence, plaintiffs argued, Helmsley-Spear was liable for plaintiff Nallan’s injuries to the extent that the injuries were a foreseeable and proximate consequence of its negligence.
As a second basis for liability on the part of both defendants, plaintiffs posited that, apart from any assumed obligation flowing from the voluntary employment of a lobby attendant, defendants were under a legal duty to exercise reasonable care in making the common areas of their building safe for tenants and their invitees. Because there had been a substantial number of crimes in the building prior to the incident in which Nallan was shot, plaintiffs argued, a jury could rationally find that personal injuries resulting from the criminal acts of third parties were a foreseeable eventuality. Hence, according to plaintiffs, defendants’ duty to maintain safe conditions in the building may have included an obligation to take reasonable steps to prevent or minimize the risk of harm from criminal activities in the lobby. Defendants would then be liable, in plaintiffs’ view, insofar as their failure to exercise due care in discharging this duty was found to be the proximate cause of plaintiff Nallan’s injury.
After both sides had been given an opportunity to present their cases, the two theories of liability advanced by plaintiffs were submitted to the jury in the form of a series of interrogatories. The jury was asked the following questions:
*515 (1) "Did William Nallan enter the Fisk Building on September 30, 1969 for the purpose of attending a [union] meeting * *
(2-a) "Did the defendant Helmsley-Spear voluntarily assume the obligation of maintaining an attendant in the lobby of the Fisk Building after 6:30 P.M.?”
(2-b) "Did the attendant in the lobby of the Fisk building * * * fail to exercise reasonable care in carrying out his duties?”
(3-a) "Did the defendants know or have reason to believe from past experience in their building and in the immediate area surrounding their building that there was a likelihood of criminal acts being committed in the Fisk building?”
(3-b) "Did the nature of the criminal acts require, in the exercise of reasonable care, that an attendant be in the lobby of the Fisk building at all times after 6:30 P.M. or that the lobby not be left unattended unless the front doors [were] locked?”
(4) "Should defendants have foreseen that injury to the plaintiff from criminal actions of a third person would probably result from [their] negligent conduct?”
(5) "Was the negligence of defendants a proximate cause of the injury sustained by plaintiff?”
Additionally, the jury was asked to consider, over plaintiffs’ objection, whether plaintiff Nallan had been contributorily negligent in attending the September 30 union meeting without taking any precautionary measures to protect himself, despite his awareness that certain threats on his life had been made.
The jury answered all but two of the interrogatories in the affirmative. Questions (3-b) and (4), however, were answered in the negative. Thus, although the jury found that defendants’ negligence was a proximate cause of plaintiff Nallan’s injury, it also concluded that the prior crimes in the building did not require defendants to post an attendant in the lobby at all times after 6:30 p.m. and, further, that the injury to plaintiff Nallan from the criminal acts of a third person was not foreseeable. As to the question of Nallan’s contributory negligence, the jury returned a verdict in favor of defendants, finding that Nallan had failed to exercise reasonable care in protecting himself and that this omission was the proximate cause of his injury.
*516 Because of this last conclusion by the jury, the Trial Judge found it unnecessary to consider whether an intelligible legal holding could be derived from the jury’s responses to the first five interrogatories.[1] Instead, the Trial Judge simply granted judgment for defendants, on the theory that the jury’s finding of contributory negligence operated as a complete bar to any recovery by plaintiffs (see, e.g., Karpeles v Heine, 227 NY 74).[2]
On appeal, the Appellate Division overturned this aspect of the trial court’s ruling. The Appellate Division initially found that the facts were insufficient, as a matter of law, to establish contributory negligence on the part of plaintiff Nallan and that, consequently, it was error for the trial court to deny plaintiffs’ motion to have the question of contributory negligence removed from the jury’s consideration (67 AD2d 719, 720). The Appellate Division held, however, that the judgment in favor of defendants was nevertheless justified, since, in its view, plaintiffs had failed to introduce evidence to support every element of their cause of action. Specifically, the Appellate Division majority found, plaintiffs had not demonstrated either that plaintiff Nallan’s injuries were foreseeable or that they were the proximate result of defendants’ conduct.[3] Hence, in the end, plaintiffs lost on the merits because of a supposed failure of proof.
Before considering the correctness of this decision, we find it necessary to make some preliminary observations concerning the proceedings below. First, we note our agreement with the Appellate Division’s conclusion that the Trial Judge erred, as a matter of law, in submitting the issue of plaintiff Nallan’s contributory negligence to the jury. To be sure, we have often said that the question of contributory negligence is "almost always * * * a question of fact” and is "almost *517 exclusively a jury function” (Wartels v County Asphalt, 29 NY2d 372, 379; see Nelson v Nygren, 259 NY 71, 76). We have also observed, however, that "contributory negligence should not be charged 'if there is no or insufficient evidence to support it’ ” (Willis v Young Men’s Christian Assn. of Amsterdam, 28 NY2d 375, 378, quoting 65A CJS, Negligence, § 293, p 1032). In truth, whether the issue is the negligence of the defendant or the contributory negligence of the plaintiff, the test for determining whether the facts pose a question for resolution by the jury remains the same: is there a "valid line of reasoning and [are there] permissible inferences which could possibly lead rational men to the conclusion [of negligence] on the basis of the evidence presented at trial”? (Cohen v Hallmark Cards, 45 NY2d 493, 499.) If no such "valid line of reasoning” exists, it is proper for the trial court to make a legal determination without resorting to the fact-finding function of the jury.
Under this standard, there can be no doubt that plaintiffs were entitled to a "directed verdict” on the issue of contributory negligence as requested. Although plaintiff Nallan was aware that he was the object of certain rather ominous threats, which were made approximately one month before the shooting, he had no reason to believe that he was under any particular danger on the night in question. Given the nature of the threats, it would be unreasonable to conclude that Nallan was obliged to take precautionary measures above and beyond notifying the police in order to satisfy his duty to protect himself from harm. Hence, there could be no rational finding of contributory negligence, and plaintiffs were entitled to have the jury instructed accordingly.
The second preliminary issue with which we must treat is the matter of the apparent inconsistency in the jury’s responses to the trial court’s interrogatories. We note that the jury answered question (4) in the negative, finding that plaintiff Nallan’s injuries were not necessarily a foreseeable consequence of defendants’ negligent conduct.[4] On the other hand, *518 the jury responded affirmatively to question (5), which asked it to consider whether defendants’ negligence was the proximate cause of plaintiff Nallan’s injury. The difficulty is that it was logically impossible for the jury to find that foreseeability was lacking in this case while, at the same time, finding that defendants’ negligence was the proximate cause of plaintiff’s injury, because, as was implicit in the Trial Judge’s instructions, foreseeability is an essential element of negligence (see, generally, Prosser, Torts [4th ed], § 43). Given this apparent inconsistency in the jury’s special findings, it would not be feasible at this point to retrace the jury’s footsteps and grant judgment for either party on the basis of its answers to the interrogatories. Thus, there will have to be a new trial to determine defendants’ liability,[5] assuming of course, that defendants were not entitled to judgment as a consequence of plaintiffs’ failure to make out a prima facie case.
Having thus narrowed the issues in the case to the single question of the sufficiency of plaintiffs’ proof, we turn now to a consideration of the merits of the Appellate Division majority’s determination. It is on this central question that we differ with the views expressed by that court, for, in our view, the evidence introduced by plaintiffs at trial was sufficient to establish a prima facie case in negligence.
 One of plaintiffs’ theories at trial was that the history of criminal activities in the Fisk Building gave rise to an obligation on the part of the building’s owner and manager to take reasonable steps to minimize the foreseeable danger to those unwary souls who might venture onto the premises.[6] *519 Such an obligation is recognized by our law, as but a natural corollary to the landowner’s common-law duty to make the public areas of his property reasonably safe for those who might enter (see, e.g., Kilmer v White, 254 NY 64; Junkermann v Tilyou Realty Co., 213 NY 404; Prosser, Torts [4th ed], § 63, pp 403-408; Restatement, Torts 2d, §§ 359-360). In this connection, we find the rule stated in the Restatement instructive:
"A possessor of land who holds it open to the public * * * is subject to liability to members of the public while they are upon the land * * * for physical harm caused by the * * * intentionally harmful acts of third persons * * * and by the failure of the possessor to exercise reasonable care to
"(a) discover that such acts are being done or are likely to be done, or
"(b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it” (Restatement, Torts 2d, § 344).
Of course, a possessor of land, whether he be a landowner or a leaseholder, is not an insurer of the visitor’s safety. Thus, even where there is an extensive history of criminal conduct on the premises, the possessor cannot be held to a duty to take protective measures unless it is shown that he either knows or has reason to know from past experience "that there is a likelihood of conduct on the part of third persons * * * which is likely to endanger the safety of the visitor” (Restatement, Torts 2d, § 344, Comment f). Only if such conditions are met may the possessor of land be obliged to "take precautions * * * and to provide a reasonably sufficient number of servants to afford a reasonable protection” (id.).
 Applying these principles to the instant case, we conclude that plaintiffs’ proof was sufficient to warrant sending the question of defendants’ liability in negligence to the jury. Plaintiffs introduced evidence that there had been 107 reported crimes in the Fisk Building in the 21 months which preceded the shooting and that at least 10 of these unlawful acts were crimes against the person.[7] Although there was no indication in the record that any of these crimes took place in *520 the lobby area, where plaintiff Nallan was shot, a rational jury could have found from the history of criminal activity in the other parts of the building that a criminal incident in the lobby was a significant, foreseeable possibility. If the jury found that defendants knew or had reason to know of the prior crimes in the building and further found that defendants should have anticipated a risk of harm from criminal activity in the lobby, it properly could have gone on to conclude that defendants failed in their obligation to take reasonable precautionary measures to minimize the risk and make the premises safe for the visiting public.[8] Moreover, even if the jury concluded that the provision of a part-time attendant would suffice to fulfill defendants’ obligation, it might still have found negligence under a respondeat superior theory if it concluded that the attendant employed failed to exercise due care in the performance of his assigned responsibilities.[9]
An entirely different problem is presented when we turn our attention to the question whether there was evidence on the record from which the jury could have concluded that defendants’ omission was the legal or proximate cause of plaintiff Nallan’s injury. In this regard, it was plaintiffs’ burden to show that defendants’ conduct was a substantial causative factor in the sequence of events that led to Nallan’s injury (see Restatement, Torts 2d, § 430; Prosser, Torts [4th ed], § 42). Of course, the fact that the "instrumentality” which produced the injury was the criminal conduct of a third person would not preclude a finding of "proximate cause” if *521 the intervening agency was itself a foreseeable hazard (see Restatement, Torts 2d, §§ 302B, 449; Prosser, Torts [4th ed], at pp 271-272).
Here, there was expert testimony in the record that the mere presence of an official attendant, even if unarmed, would have had the effect of deterring criminal activity in the building’s lobby. This was so, according to plaintiffs’ expert, whether the crime in question was one of random violence or was a deliberate, planned "assassination” attempt such as apparently occurred in this case. The clear implication of the expert testimony was that a would-be assailant of any type would be hesitant to act if he knew he was being watched by a representative of the building’s security staff. Contrary to the reasoning of the majority at the Appellate Division, it would seem to us that the deterrent effect described by plaintiffs’ expert witness would exist whether the lobby guard was a "trained observer” or, as here, was an ordinary attendant with no special expertise in the area of building security, since that fact would make no difference from the potential assailant’s point of view. Thus, the jury in this case might well have inferred from the available evidence that the absence of an attendant in the lobby at the moment plaintiff Nallan arrived was a "proximate” cause of Nallan’s injury. Accordingly, it cannot be said that plaintiffs failed to introduce evidence sufficient to make out a prima facie case.
Before closing, we deem it necessary to make a few remarks about plaintiffs’ second trial theory, under which defendant Helmsley-Spear, Inc., was to be held liable if the jury found that it negligently performed an assumed obligation to provide a lobby attendant. Preliminarily, we note that, since there must be a new trial in any event, we have no occasion to comment upon the manner in which this theory was charged to the jury or upon the possibility that defendant HelmsleySpear effectively consented to the charge by failing to raise a specific and timely objection (see CPLR 4110-b). Our remarks in this connection are intended only to highlight some of the limitations inherent in plaintiffs’ stated theory.
It was plaintiffs’ position at the trial that, by undertaking to employ an attendant to watch the lobby, defendant HelmsleySpear had assumed a duty, the negligent performance of which could lead to liability, even if there was no legal obligation in the first instance to provide a lobby attendant. Much of the argument in the parties’ briefs on this point was *522 devoted to the question whether the evidence would support a jury finding that the employment of the attendant in this case represented an undertaking by Helmsley-Spear to provide some protective services to the building’s tenants and their guests.[10] We note, however, that even if this essentially factual dispute were resolved in favor of plaintiffs, it would not necessarily follow that Helmsley-Spear could be held liable for temporarily withdrawing or negligently performing such services. The formula for determining when "one who assumes a duty to act, even though gratuitously, may thereby become subject to the duty of acting carefully” has been articulated by Chief Judge Cardozo as follows: "If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward * * * The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good” (Moch Co. v Rensselaer Water Co., 247 NY 160, 167-168; cf. Florence v Goldberg, 44 NY2d 189, 196-197).
In the circumstances of this case, the application of this principle would require plaintiffs to show not only that defendant Helmsley-Spear undertook to provide a service and did so negligently, but also that its conduct in undertaking the service somehow placed plaintiff Nallan in a more vulnerable position than he would have been in had Helmsley-Spear never taken any action at all. Plaintiffs might show, for example, that because Nallan was familiar with the building’s after-hours procedures and expected that an attendant would be present, he was lulled into a false sense of security and, as a consequence, neglected to take the precautions he might otherwise have taken upon entering the building. In short, *523 defendant Helmsley-Spear could be held liable under an "assumed duty” theory only if it was reasonably foreseeable that members of the public, such as Nallan, would rely upon the continued presence of a building attendant in the lobby of the Fisk Building and would tailor their own conduct accordingly (see Restatement, Torts 2d, § 323, subd [b], and Comment c). In this regard, the record contains evidence which would tend to support a finding of liability under this theory and it is assumed that plaintiffs will advance it upon a retrial.
For all of the foregoing reasons, the order of the Appellate Division should be reversed, with costs, the complaint reinstated and the matter remitted for a new trial in accordance with this opinion.
Chief Judge Cooke and Judges Jasen, Jones, Wachtler and Fuchsberg concur; Judge Meyer taking no part.
Order reversed, etc.

. Both parties argued to the Trial Judge that they had previously agreed to a procedure whereby the jury would deliver a general verdict in favor of one side or the other, as well as its specific responses to the interrogatories posed by the court. The Trial Judge, however, maintained that this had not been his understanding and that his charge to the jury required it to return only a "special” verdict on particular factual issues, leaving to the court the task of determining which party was entitled to judgment on the jury’s findings (see CPLR 4111, subd [c]).

. Plaintiffs’ cause of action accrued in 1969, almost six years before New York abrogated the contributory negligence rule and adopted the comparative negligence approach to unintentional tort liability (see L 1975, ch 69).

. Because it concluded that plaintiffs had not made out a prima facie case, the Appellate Division did not find it necessary to attempt to reconcile the apparent inconsistencies in the jury’s special findings (67 AD2d, supra, at p 721).

. Plaintiffs contend that the wording of question (4) was inherently misleading, in that it suggested to the jury that it could find foreseeability only if it concluded that defendants should have anticipated an assassination attempt directed specifically at plaintiff Nallan. Having read the trial court’s charge as a whole, however, we are of the opinion that it adequately informed the jury that it need not find the precise circumstances surrounding Nallan’s injury foreseeable, as long as it found that there was a foreseeable risk of harm resulting from the criminal activities of third persons on the premises.

. We note that, had there not been a finding of contributory negligence, the Trial Judge in this case would have been justified in asking the jury to reconsider its apparently irreconcilable factual findings. Although CPLR 4111 (subd [c]l contemplates such action by the trial court only when the jury’s answers to interrogatories are accompanied by a general verdict and there is an internal inconsistency, we see no reason why this remedy should not be available in a case where the jury’s function has been limited to the returning of a special verdict.

. At the trial, there was some question as to whether plaintiff Nallan had entered the building under the status of a “business invitee” of one of defendants’ tenants. We note, however, that, shortly after the trial was concluded, this court handed down a decision in which we made it clear that the status of a person injured on another’s land is not to be the determinative factor in assessing the landowner’s duty of care (Basso v Miller, 40 NY2d 233). Thus, whether plaintiff Nallan was a "business invitee” or a visitor of some lesser status is but one of the many considerations that must be taken into account in determining whether the risk of harm to him was foreseeable under the circumstances (see Scurti v City of New York, 40 NY2d 433).

. The jury was instructed that it could consider the crime rate in the immediate vicinity of the Fisk Building as well as the crimes that occurred in the building itself. Inasmuch as defendants did not object to this aspect of the trial court’s charge, we have no occasion to consider its propriety (see CPLR 4110-b).

. What safety precautions may reasonably be required of a landowner is almost always a question of fact for the jury. Conceivably, in assessing the reasonableness of the landowner’s conduct, the jury might take into account such variables as the seriousness of the risk and the cost of the various available safety measures.

. There was some testimony that the attendant in this case was not required by his employers to man the lobby desk at all times and that, in fact, his custodial duties mandated that he occasionally leave his post to perform minor cleaning chores. There was further testimony, however, that when the attendant was required by his duties to leave the lobby area, he customarily either locked the front doors of the building or, if that was not feasible, called a matron to take his place temporarily.
Given these facts, there existed at least two possible approaches to finding defendants liable in negligence. If, on the one hand, the jury found that the attendant had been directed by his employers to take such precautionary measures, either expressly or implicitly, it could have further concluded that the attendant’s failure to follow his directions in the face of a foreseeable risk constituted negligence that is vicariously attributable to his employers. If, on the other hand, the jury found that no such instructions had been given to the attendant, it could have drawn the conclusion that defendants themselves were negligent in not furnishing a full-time attendant to watch the lobby after business hours. In either case, liability might well result.

. We find that there was ample evidence on the record from which the jury could conclude that defendant Helmsley-Spear had indeed undertaken to provide minimal building security through the use of a lobby attendant. Although it is true that the attendant in this case was unarmed and untrained, his stated duties included such security-related activities as breaking up fights in the lobby, escorting unwanted visitors out of the building and phoning the police if he observed any suspicious conduct within his bailiwick. The fact that the attendant had additional cleaning duties does not in itself detract from the reasonable inference that may be drawn from the evidence as a whole that the attendant was intended to act, at least in part, as a lobby guard.