Alexander, J.
(dissenting). This is a negligence action to recover damages for self-inflicted injuries sustained by plaintiff on October 21, 1977 while in the custody of the New York City Department of Corrections. Defendant, the City of New York, is charged with failing to take proper precautions to ensure plaintiff’s safety and in failing to obtain medical treatment for him during the 36 hours he remained incarcerated awaiting arraignment. A jury trial resulted in a judgment for plaintiff. The Appellate Division reversed the judgment and dismissed the complaint, holding that plaintiff had failed to set forth a prima facie case. A majority of this court affirms that order. Because I believe that the evidence at trial, when viewed in the light most favorable to plaintiff, as we are bound to do, supports a prima facie case, I respectfully dissent.
On October 19, 1977, plaintiff, then age 19, was arrested and charged with attempted grand larceny and criminal possession of burglar’s tools, having been observed by police officers attempting to break into an automobile. At trial it was established that at the time of his arrest, plaintiff had a two-year history of severe psychiatric problems; he had been diagnosed variously as "acute psychotic episode catalytic” and "schizophrenia paranoid type”, and had been institutionalized on more than one occasion. One episode resulted in his commitment to Brooklyn State Hospital, where he stayed for over two weeks and was released on November 16, 1976 with prescriptions for several medications, including thorazine. *843 About a month after his discharge, the supply was exhausted and plaintiff stopped taking the medication.
Plaintiff’s mother testified that in the two months preceding his arrest, plaintiff had again become "very loud and aggressive”, acting "crazy” and "hard to handle”. On the night he was arrested, the police confined him to a holding pen in Kings County Criminal Court pending arraignment and telephoned his mother to notify her of her son’s arrest. Calling her attention to the noise in the background, they asked: "Is he always this noisy and crazy? Does he have any mental problems?”. She responded: "Yes, he has been in Kings County Psychiatric Hospital”.
For reasons not apparent from the record, defendant was not arraigned the next day, but was moved to the basement pens of the courthouse and held for a second night. The following morning, when Correction Officer Moore came on duty, plaintiff had been segregated from the other inmates and placed in a separation pen — a 10-foot square, 15-foot high cell, with bars on three sides and a steel wall comprising the fourth side, containing a toilet bowl, a sink, a steel bench and a ceiling light — because he had been "rejected by the other prisoners” in the main holding pen. The record reveals that plaintiff was loud, acting irrationally, hallucinating and continuously yelling out "I am God”, "Jesus Christ Superstar”, and that he would like to fly. Correction Officer Moore was advised by the officer he relieved "that is the psycho * * * [tjhis guy is a nut, watch out for him”. Plaintiff’s shoelaces and belt had been taken away from him when he was moved to the separation pen, because, as Moore testified, "when we think that the individual is a psycho, as we call [it] in our terms, we take the shoelaces and belts from him * * * because it’s a possible suicide”. Testimony established that it is not the usual practice to confine prisoners to a separation pen.
Correction Officer Moore was assigned, as was the custom, to a station where he could monitor the three holding pens in the area simultaneously — including plaintiff’s separation pen. Officer Moore testified that when he came on duty, plaintiff was making loud noises, pacing about, repeatedly flushing the toilet and pushing the button on the sink and hallucinating— as he had been doing earlier — about being "Jesus Christ Superstar” and how he would like to fly. Officer Moore testified that plaintiff was irrational, "just wasn’t coherent”, and that he considered him a "psycho”. Some 15 minutes later, plaintiff started climbing the bars of his cell, ignoring orders *844 from Correction Officer Moore to get down. Moore began climbing the bars after plaintiff and called for assistance shouting "I got a possible hang up” (suicide attempt). Before assistance could arrive, plaintiff either fell or dove head first in the direction of the toilet bowl and hit his head. Moore testified that he had seen prisoners climb the bars of the pens numerous times in the past.
Plaintiff’s theory at trial was that defendant was negligent in failing to take proper precautions to prevent him from harming himself. In particular, he argued that defendant was negligent in not restraining or immobilizing him to ensure that he was not capable of hurting himself, and further was negligent in failing to seek the assistance of medical personnel at any time during the 36 hours he was in custody. Expert medical testimony established that the correction officer, who observed the plaintiff’s conduct and his hallucinations, should have realized that he needed medical attention — that "it would not have taken any huge skill to see that the lad was ill at that time”, and that, under these circumstances, plaintiff should not have been left alone and should have been restrained either physically or by medication. A former warden of a correctional facility also testified for plaintiff and explained that the proper procedure when a correction officer is confronted with a prisoner acting irrationally is to ensure that the inmate is not capable of hurting himself, or any other person, by immobilizing him, perhaps handcuffing him to a particular object, and then calling a supervisor for medical assistance. He testified further that even if the correction officer believes the prisoner is feigning illness, proper procedure would require that the evaluation be made by medical personnel because the correction officer could be mistaken. Plaintiff also relied on regulation 7.10.020 of the Rules and Regulations of the Department of Corrections, in effect at the time, which provided: "Whenever an inmate appears to be injured or sick, prompt action shall be taken to ensure that the inmate concerned is examined by a physician. In instances where there is no physician on duty within the institution an ambulance shall be summoned.”
Defendant offered evidence to establish that its actions were reasonable and consistent with the policies of the Department of Corrections. The Special Counsel to the New York City Commissioner of Corrections, who was responsible for writing rules and regulations for the Department, testified that Department policy prohibited the use of restraints without the *845 specific authorization of a physician, except in an emergency situation such as to prevent injury to the inmate or others or to prevent an escape, and that Department policy disfavored using metal handcuffs as restraints because somebody who is distraught could easily injure himself while restrained in that manner.* He conceded, however, that a correction officer was authorized to "apply temporarily metal cuffs” in an emergency but is required in such circumstances to "simultaneously * * * contact a superior officer so that * * * a physician [can be summoned to the] scene”. Finally Special Counsel testified that, in his opinion, the actions taken by Correction Officer Moore were proper and in accordance with Department procedures, that physicians are not summoned whenever an inmate says irrational things, and plaintiff’s behavior — prior to the moment he began climbing the bars — did not warrant medical attention.
The jury returned a verdict in favor of plaintiff. The Appellate Division reversed the judgment and dismissed the complaint, holding that "as a matter of law, the actions taken with regard to the plaintiff were entirely reasonable under the circumstances” in that plaintiff was constantly monitored and there was nothing in the cell with which he could hurt himself (120 AD2d, at 564).
As the majority recognizes, prison authorities owe a duty of care to provide for the health and care of inmates, including the duty to protect a prisoner from harming himself (see, O’Grady v City of Fulton, 4 NY2d 717, affg 4 AD2d 743; Wilson v Sponable, 81 AD2d 1, 5; Lavigne v Allen, 36 AD2d 981). If prison authorities know or have reason to know that the prisoner might do harm to himself or to others, reasonable care must be used to assure that such harm does not occur, and certain factors, such as the prisoner’s mental state, are to be considered in determining how to prevent the harm (see generally, Annotation, Civil Liability of Prison or Jail Authorities for Self-Inflicted Injury or Death of Prisoner, 79 ALR3d 1210).
Of course, even where a duty exists, liability in a particular case may not be imposed if injury is not foreseeable (Pulka v *846 Edelman, 40 NY2d 781, 786). "Whether a breach of duty has occurred, * * * depends upon whether the resulting injury was a reasonably foreseeable consequence of the defendant’s conduct. 'If the defendant could not reasonably foresee any injury as the result of his act, or if his conduct was reasonable in the light of what he could anticipate, there is no negligence and no liability’ (Prosser, Torts [4th ed], § 43, p 250)” (Danielenko v Kinney Rent A Car, 57 NY2d 198, 204 [emphasis added]). It has never been the case, however, as the majority holds, that a plaintiff is required to demonstrate that the defendant could have anticipated the precise manner in which the injury in fact occurred. Rather the settled law holds that it is sufficient that the evidence establish that it was foreseeable that plaintiff would harm himself and that his injuries could have been prevented if the defendant had not been negligent (see, Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315). Questions concerning what is foreseeable and what is reasonable conduct under the circumstances are generally for the fact finder and not for the court to resolve (see, Derdiarian v Felix Contr. Corp., 51 NY2d, at 315, supra; Akins v Glens Falls City School Dist., 53 NY2d 325, 332; Andre v Pomeroy, 35 NY2d 361, 364 [whether defendant acted reasonably under the circumstances can rarely be decided as a matter of law]; see generally, Restatement [Second] of Torts § 328B, comment g, at 154; § 328C, comment b, at 155).
For a court to conclude as a matter of law that a jury verdict is not supported by sufficient evidence it must be determined "that there is simply no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial” (Cohen v Hallmark Cards, 45 NY2d 493, 499; see, Randolph v City of New York, 69 NY2d 844, 847; Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 517). In analogizing this assessment to a Trial Judge asked to direct a verdict, we remarked that "in any case in which it can be said that the evidence is such that it would not be utterly irrational for a jury to reach the result it has determined upon, and thus a valid question of fact does exist, the court may not conclude that the verdict is as a matter of law not supported by the evidence” (Cohen v Hallmark Cards, 45 NY2d 493, 499, supra; Middleton v Whitridge, 213 NY 499, 507-508). The standard is strict, and appropriately so, in order to preserve the role of the jury and to avoid the propensity, on appellate review, to sit as a "thirteenth juror’’. Moreover, because *847 plaintiff has prevailed on the liability issue at trial, and the sole issue on this appeal is whether the evidence was insufficient as a matter of law to support a finding of breach of duty, we are bound to view the evidence in the light most favorable to the plaintiff (see, Hill v St. Clare’s Hosp., 67 NY2d 72, 82; Alexander v Eldred, 63 NY2d 460, 464; Derdiarian v Felix Contr. Corp., 51 NY2d 308, 312, n 1, supra; Cohen v Hallmark Cards, 45 NY2d 493, 499, supra; Dunham v Village of Canisteo, 303 NY 498, 503).
Applying this standard of review, the evidence was clearly sufficient for the jury to have rationally concluded that defendant acted negligently in failing to seek medical attention for plaintiff at any time during his 36 hours of confinement. Defendant was on notice that plaintiff may have been suffering from mental illness. Not only did plaintiff’s mother inform the arresting officer of prior hospitalization for mental illness, but plaintiff had acted irrationally throughout his confinement. Indeed, he had been placed in a separation pen precisely because he was acting in an abnormally irrational manner, and hallucinating to such an extent, that he was considered a "psycho”, suicidal. The correction officer in charge of plaintiff — before Correction Officer Moore came on duty — thought that plaintiff was sufficiently mentally ill and posed a sufficient threat of physical harm to himself and to others, that he should be segregated and treated as "suicidal”. Moreover, his shoelaces and belt were taken from him because of the belief that he may harm himself. The undisputed evidence is that plaintiff was treated differently from those exhibiting the type of irrational behavior that may be common in court pens. Yet it was undisputed that no medical attention had been sought for plaintiff at any time while he was in custody despite the fact that expert testimony established that he was in need of medical care and that the Department regulations require that "prompt action shall be taken” when an inmate is sick to ensure he receives medical attention. The jury could have rationally concluded that defendant, with knowledge of the danger that plaintiff might harm himself because of his delusional behavior, acted unreasonably in failing to obtain medical attention for plaintiff, not only on the morning of the accident, but during the preceding hours as well.
Furthermore, the jury could have reasonably concluded from the evidence that plaintiff should have been restrained, if not by metal cuffs then by other approved methods, until *848 medical personnel could determine whether plaintiff was in need of care. Although defendant’s expert testified that restraints were disfavored unless authorized by a physician, he also testified that restraints may be used to prevent the prisoner from injuring himself as long as a physician is summoned to assess the medical necessity for the restraints. The jury could have reasonably inferred that since Correction Officer Moore had seen prisoners climbing cell bars many times in the past, it was a common occurrence, and that defendant could have reasonably foreseen that plaintiff, in a state of mental instability, might climb the bars and injure himself.
Accordingly, there is a "valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury” (Cohen v Hallmark Cards, 45 NY2d, at 499, supra) that defendant’s conduct under the circumstances of this case was not reasonable such that defendant breached a duty of care owed to plaintiff either by failing to render the appropriate medical treatment, or by failing to restrain him. That there was conflicting evidence as to the appropriate response to an inmate in plaintiff’s condition, does not justify dismissing the complaint on the ground that the jury’s verdict was not based on legally sufficient evidence (Randolph v City of New York, 69 NY2d 844, 847, supra).
"[I]n deciding as a matter of law exactly what steps by [the Department of Corrections] will constitute reasonable care under the circumstances”, the majority "engages in an unfortunate exercise in judicial rule making in an area that should be left to the jury” and fails to accord the plaintiff the benefit of favorable evidence and reasonable inferences (Akins v Glenn Falls City School Dist., 53 NY2d 325, 333-334 [Cooke, Ch. J., dissenting], supra). It has long been the "general rule that care commensurate with the danger must be exercised, and it is also a general rule that it is the province of the jury, and not of the court, to determine whether such care has been exercised” (Dolan v Delaware & Hudson Canal Co., 71 NY 285, 288, quoted in Akins v Glens Falls City School Dist., 53 NY2d 325, 335 [Cooke, Ch. J., dissenting], supra). Plaintiff carried his burden of demonstrating that the defendant’s negligence was a proximate cause of the events which produced the injury (see, Derdiarian v Felix Contr. Co., 51 NY2d 308, 315, supra; Nallan v Helmsley-Spear, Inc., 50 NY2d 507, 520, supra). I would, therefore, reverse the order of the Appellate Division and remit the case to the Appellate Division for *849 that court to consider the facts and the issues not reached on the appeal to that court.
Chief Judge Wachtler and Judges Kaye, Titone, Hancock, Jr., and Bellacosa concur; Judge Alexander dissents and votes to reverse in an opinion in which Judge Simons concurs.
Order affirmed, with costs, in a memorandum.

 The Department memorandum from which defendant’s expert testified defines "anklets and wristlets” as medically approved types of restraints which are "generally made of heavy leather with sponge rubber lining” and are "useful in mildly delirious patients” because they provide firm restraint but permit some freedom of motion and are not uncomfortable or painful for the prisoner.