Gerald SCHAEFFER, Edith Schaeffer, Alisa Schaeffer, and Jennifer Schaeffer, through her next friend, Edith Schaeffer, Plaintiffs,

v.

VERA WANG BRIDAL HOUSE, LTD. and Hotel Carlyle Management Corp., Defendants.

No. 96 Civ. 1250 (DC).

United States District Court, S.D. New York.

Sept. 8, 1999.

Jacobs, Grudberg, Belt & Dow, P.C. by Howard A. Jacobs, William M. Bloss, New Haven, CT, Warren L. Miller, Washington, DC, Stillman, Friedman & Shaw, P.C., New York City, for Plaintiffs.

Lester Schwab Katz & Dwyer by Howard F. Strongin, New York City, for Defendant Vera Wang Bridal House, Ltd.

## MEMORANDUM DECISION

CHIN, District Judge.

In this case, plaintiffs Gerald Schaeffer, Edith Schaeffer, Alisa Schaeffer, and Jen- nifer Schaeffer, through her next friend, Edith Schaeffer (collectively, the "Schaeffers"), seek damages in excess of one hundred million dollars for personal injuries sustained during an armed robbery of defendant Vera Wang Bridal House, Ltd. ("Vera Wang") on March 23, 1994. During the robbery, plaintiffs Gerald and Edith Schaeffer were shot and seriously injured by two gunmen, who had followed the Schaeffers into Vera Wang with the intention of stealing Edith Schaeffer's six-and-a-half carat diamond ring.

The Schaeffers assert negligence claims against Vera Wang arising out of the events of the March 23, 1994 robbery, based on Vera Wang's alleged failure to provide adequate security. Vera Wang moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing the complaint, on the grounds that the Schaeffers fail to raise a genuine issue of fact as to whether (1) the harm suffered by the Schaeffers was foreseeable, and (2) their injuries were proximately caused by any negligence on the part of Vera Wang. For the reasons that follow, Vera Wang's motion for summary judgment is denied.

## BACKGROUND

The Schaeffers are residents of Potomac, Maryland. During the week of March 21, 1994, the Schaeffers were visiting New York City. Gerald and Edith Schaeffer's daughter, Alisa Schaeffer–Halle, had recently become engaged, and the Schaeffers had traveled to New York to shop for wedding gowns at Vera Wang. The Schaeffer family's appointment at Vera Wang was scheduled for the afternoon of March 23, 1994. That morning, the Schaeffers went shopping at Bergdorf Goodman and Harry Winston's Jewelers, had lunch at Barney's New York, and then took at cab to Vera Wang, which is located in the Hotel Carlyle (the "Hotel") at Madison Avenue and 77th Street, on the Upper East Side of Manhattan.[1]

1. The Schaeffers also sued the Hotel in this action, but those claims have been settled.

The Schaeffers arrived at Vera Wang at approximately 1:30 p.m. They entered the bridal shop reception area, which was located on the ground floor of the building, and spoke briefly to the receptionist, Eva Kamberaj. After filling out an appointment card, the Schaeffers were taken upstairs to the second floor, where the sales area was located, to look at dresses with a salesperson, Jennifer Ciccone.

## A. *The Robbery*

Shortly after the Schaeffers had arrived and had been escorted upstairs to the sales floor, two men approached the door to Vera Wang. The front of the bridal shop, including the entrance, is primarily glass. The front door was usually kept locked at all times, and customers were permitted access by a buzzer system that controlled the lock on the front door. Kamberaj described the two men standing at the door as wearing standard business attire, *i.e.*, jackets, collared shirts, and slacks. She pressed the buzzer to unlock the door and allow them into the bridal shop. Kamberaj testified at her deposition that when she went to press the buzzer to let the men it, she "didn't get it. The door was [already] opened." (Kamberaj Tr. at 133). Thus, whether the receptionist intentionally let them into the shop, or they gained entry on their own because the door was already unlocked, the two men succeeded in entering Vera Wang with no difficulty.[2]

Although there are discrepancies in Kamberaj's testimony as to what occurred when the men first entered Vera Wang, the basic facts are as follows. The two men approached Kamberaj at the reception desk. One of the men, later identified as Randy Caggiano, asked Kamberaj if he could go upstairs. Kamberaj replied that he could not go upstairs unless he had an appointment. Next, the men apparently told Kamberaj that they were "looking for

somebody and named a name." (Hazzard Tr. at 93). Kamberaj looked up the name in her appointment book, but it was not there, so she told the men that the person they were looking for was not on the premises. Caggiano then changed his story. He said that his daughter was getting married very soon, and that he wished to go upstairs to look at some dresses on her behalf. Kamberaj again declined Caggiano's request to be permitted to go upstairs to the sales floor. At that moment, Kamberaj was interrupted by a delivery man who appeared at the door. Kamberaj buzzed him in and took care of whatever business he had, and he left. Kamberaj then offered Caggiano a business card, told him to make an appointment, and "kind of sarcastically" pointed out that he should bring his daughter with him next time. (Kamberaj Tr. at 153, 155, 159).

At this point, Caggiano's companion, later identified as Sandor Sebok, started to leave the shop, but Caggiano turned to him and told him, "no, no, no, come on," so Sebok remained. (*Id.* at 155, 161). As a result of this exchange, Kamberaj became nervous as she began to suspect that the men were not legitimate customers because men did not generally come to the shop to look at wedding dresses without the prospective bride. She became even more nervous when Caggiano changed his story yet again. This time, he told Kamberaj that he and Sebok were detectives, and that they were "looking for the Silversteins." (*Id.* at 155–56). Caggiano then asked whether Kamberaj knew the Silversteins and then ordered her to get her manager, Brenda Babcock. By this time, Kamberaj knew something was wrong, so she called Babcock on the intercom and told her to "come up here now" and repeated her request a few seconds later. (Babcock Tr. at 59, 60). Babcock testified that Kamberaj's tone was "bossy and emp-

---

**2.** There is some dispute as to whether the lock was functioning properly on the day of the robbery and, if it was not, whether this fact has any bearing on the instant motion, as Kamberaj testified that she intended to let the two men into the shop in any event.

hatic," which indicated to her that there was a problem. (*Id.* at 59–60, 62–64).

Before Babcock arrived, Kamberaj tested Caggiano's claim that he was a police detective and requested to see his identification. In response to her request, Caggiano produced a handgun. As part of Vera Wang's security system, there was a "panic button" located underneath the reception desk. Kamberaj moved her hand toward the alarm button under the desk, but Caggiano saw her and ordered her to move away from the desk before she had a chance to reach the button. Seconds later, Babcock arrived at the reception area. Caggiano placed the gun in Babcock's back and then ordered Kamberaj and Caggiano upstairs.

Once again, the precise details of the events that immediately followed are unclear, but in substance, they are as follows. Sebok approached Gerald Schaeffer, who had been sitting in a hall area near the top of the stairs, and demanded his wallet. Gerald Schaeffer and Sebok struggled for a few seconds, and as Gerald Schaeffer was attempting to push Sebok down the stairs, Sebok shot him once in the stomach.

Meanwhile, when Caggiano reached the top of the stairs, he passed Gerald Schaeffer and immediately spotted Edith Schaeffer about twenty-five feet away in the next room and shouted at her to give him her ring. Maintaining the gun in Babcock's back, Caggiano and Babcock began walking toward Edith Schaeffer. As he approached Edith Schaeffer, he grabbed her arm, took the gun off Babcock and pointed it at Edith Schaeffer, and again demanded that she give him her ring, saying, "I want that ring." (Edith Schaeffer Tr. at 70). Edith Schaeffer apparently misunderstood what Caggiano was referring to, so she did not immediately remove her ring and give it to Caggiano. Caggiano misinterpreted Edith Schaeffer's confusion as resistance, and then started pulling at her hand to get

the ring off her finger. Edith Schaeffer testified that, because her "hand was swollen," the ring "wouldn't come off," but that she was "desperately trying to get it off," and that as it came off, Caggiano shot her. (*Id.* at 70–71).

After Caggiano shot Edith Schaeffer, Babcock, Kamberaj, and Ciccone escaped through the rear exit of the shop that exits into a hallway within the Hotel and called the police. Alisa and Jennifer Schaeffer remained in the shop to care for their parents until an ambulance arrived. Caggiano and Sebok apparently slipped out during the confusion some time before the police and ambulance arrived.

As a result of the shootings, Gerald Schaeffer sustained serious injuries to his stomach, colon, and small intestine. Edith Schaeffer also suffered serious injuries, including broken ribs and injuries to her small intestine, pancreas, liver, and colon. Alisa and Jennifer Schaeffer claim to have suffered psychological injuries from having witnessed the robbery and shooting of their parents.

## B. *The "Bistro Bandits" Crime Spree*

The March 23, 1994 robbery and shooting at Vera Wang was not an isolated incident. Indeed, the incident was the eighth in a series of nine robberies perpetrated by Caggiano[3] on the Upper East Side between 1991 and June of 1994. According to police records, all of the robberies were characterized by the same *modus operandi*. In each case, the victim was an older, well-to-do woman; the property stolen was a large diamond ring; the crimes were committed on the Upper East Side of Manhattan; the perpetrators were well-dressed and therefore easily blended into the Upper East Side neighborhood in which the crimes took place; most of the robberies occurred shortly after the victim had left a restaurant, retail establishment,

---

3. Caggiano participated in all nine robberies. He perpetrated most of the crimes with an accomplice, either Sebok or Robert Segal, although a few of the robberies were committed by Caggiano alone.

or other public place, suggesting that the perpetrators had followed the victim; and most of the crimes were committed in the presence of witnesses.

In December 1993, after the fourth robbery, the New York City Police Department (the "NYPD") contacted the media about the series of armed robberies that had occurred on the Upper East Side of Manhattan. On December 11, 1993, the *Daily News* printed an article about the robberies in which the thieves were dubbed the "Bistro Bandits." Articles also appeared in the *New York Times, Newsday,* and a local Upper East Side paper, and reports of the robberies appeared on local television stations. Included among the articles and news reports was a police sketch of the suspects that had been drawn based on victims' descriptions of the perpetrators.

Shortly thereafter, Roderick Williams, the security director at the Hotel during the time of the robberies, posted several of the newspaper articles on an employee bulletin board at the hotel. In addition, Williams made copies of a "WANTED" poster that had been given to him by the police and posted one of the copies on the same bulletin board, and distributed the remaining copies to the four shops within the hotel that faced Madison Avenue, including Vera Wang. Williams testified at his deposition that he recalled discussing the robberies with "two or three girls" in the Vera Wang shop. (Williams Tr. at 37). He testified further that he directed them to "keep an eye out" for the suspects, and to "watch for these type of people and don't let anybody in suspicious and to call [him] if [they] ha[d] a doubt." (*Id.* at 37–38). Williams warned that the robbers were "extremely dangerous." (Tighe Tr. at. 28).

When questioned at their depositions about these communications from Williams, most of the Vera Wang employees disclaimed any knowledge of the robberies prior to the robbery that occurred at Vera Wang. Kamberaj and other Vera Wang employees denied having seen the "WANTED" poster that Williams claimed to have circulated, and denied having seen the newspaper articles describing the robberies. The sales assistant who assisted the Schaeffers on the day of the robbery, Jennifer Ciccone, conceded that she had seen the *Daily News* article and police sketch at the Vera Wang shop in December 1993. Paul Zachman, Vera Wang's controller, also testified that he had read about the robberies in the area.

Caggiano, Sebok, and Segal were ultimately arrested on July 8, 1994, a few weeks after the commission of the ninth robbery. Caggiano and Sebok were tried for the robbery and shooting of the Schaeffers at Vera Wang. Both men were convicted of attempted murder, four counts of assault, four counts of robbery, two counts of assault, and Caggiano was also convicted of two counts of criminal possession of a weapon. Caggiano and Segal subsequently pleaded guilty to robbery charges stemming from several of the other robberies. As a result his convictions and guilty pleas in connection with the Upper East Side robberies, Caggiano was sentenced to three terms of imprisonment of 12½ to 25 years, one term of 65½ to 131 years, and one term 52½ to 105 years, all to run consecutively. Sebok was sentenced to two consecutive terms of imprisonment of 12½ to 25 years, to run consecutively with one term of 3½ to 7 years, in addition to three concurrent terms of imprisonment of 7½ to 15 years and one term of 3½ to 7 years, to run concurrently with the above consecutive terms.

## C. *Evidence of Prior Crimes at Vera Wang and in Surrounding Areas*

Aside from the March 23, 1994 robbery and shooting that is the subject of this lawsuit, no serious crimes have ever occurred in the Vera Wang bridal shop. The only prior incident that any Vera Wang representative could recall having occurred at the shop that was even remotely criminal in nature was a complaint by an em-

ployee that money was missing from her purse. The employee never reported her complaint to the police, however, and therefore no investigation was commenced.

On the other hand, while there had been virtually no crime on Vera Wang's premises before the events of March 23, 1994, a number of crimes had occurred in the areas surrounding the shop and the Hotel. For example, in 1993, there was a hostage-taking incident in a gallery located across the street from the Hotel in which the perpetrator held a knife to the throat of the gallery's receptionist. On January 4, 1994, a vehicle was car-jacked approximately one block away from the Hotel. On March 10, 1994, a car parked 25 feet from the entrance of the Hotel was broken into and vandalized. Williams, the security director of the Hotel, testified that during his tenure there were at least four or five armed robberies inside the hotel's garage. In addition, there were several minor thefts and purse snatchings in and around the Hotel in the months preceding the March 23, 1994 incident.

Vera Wang is situated within the 19th precinct of the NYPD. The 19th Precinct covers the area from the north side of East 59th Street through the south side of East 96th Street, from the East River to Fifth Avenue. According to police statistics compiled by the NYPD's Crime Analysis Unit for the 19th Precinct, in 1993 there were 1,365 armed robbery complaints within the precinct, and 1,096 such complaints in 1994, 311 of which occurred in the period January through March 1994. In addition, during the first three months of 1994, there were 94 felony assault complaints, 590 burglary complaints, and 2,664 felony complaints in total.

### D. The Experts' Reports

The Schaeffers and Vera Wang both retained the services of security experts to give their professional opinions on various aspects of the March 23, 1994 robbery at Vera Wang. According to the report of one of the Schaeffers' experts, William H. Brill, "Vera Wang had a limited commitment to security." (Brill Decl. ¶ 3). Among other things, Brill faults Vera Wang for its failure to install an intercom, train its staff in security issues, and train its receptionist in the proper screening of visitors or the use of the "kneewell" alarm system. In Brill's opinion, the presence and proper use of an intercom in particular would likely have been a strong deterrent to Caggiano and Sebok. According to Brill, a properly trained receptionist would have had the opportunity to speak with Caggiano prior to permitting him access to the shop and likely would have been suspicious of his stories and refused him entry. Indeed, Brill actually interviewed Caggiano in the course of preparing his report, and based on those interviews, Brill opines that Caggiano would probably not have attempted to enter the shop had an intercom been in use. Brill contends that the cost of installing an intercom and implementing other minimal security measures would have been slight, "no more than a few hundred dollars." (Id. ¶ 5). The report of the Schaeffers' other security expert, Gerald A. O'Rourke, essentially concurred with that of Brill. (See O'Rourke Decl.).

In contrast, Vera Wang's expert, Park Dietz, concluded that "the crimes committed at the Vera Wang Bridal House on March 23, 1994, constituted an extraordinary attack that was not reasonably foreseeable in this type of establishment." (Strongin Aff. Ex. EE). The principal reasons offered for this conclusion were (1) the fact that Vera Wang is a "low risk environment for armed robbery because it does not handle cash or merchandise that can readily be converted to cash, does not operate during nighttime hours, and does not offer an isolated victim (in contrast to such environments as convenience stores, taxis, liquor stores, and ATM machines)" (id. (citation omitted)), and (2) the fact that none of Caggiano's prior robberies had occurred in a bridal salon or similar type of establishment. Dietz further opined

that Caggiano and Sebok "were not deterrable with security measures that would be reasonable for" an establishment such as Vera Wang, and that, therefore, there was "no action that employees of the Vera Wang Bridal House could have taken to limit or reduce the harm done to the Schaeffers." (Id.). Finally, Dietz concluded in his report that "the two armed robbers ... were drawn to the Vera Wang Bridal House by Mrs. Schaeffer's diamond and would have devised a pretext for gaining entry to the Salon regardless of the type of door, locking mechanism, video surveillance, intercom communication, screening procedure, witness presence, or unarmed guard presence in effect at the time they approached their target." (Id.). In short, Dietz concluded that Caggiano and Sebok were determined to steal Edith Schaeffer's ring at all costs, and would have stopped at nothing to do so.

### DISCUSSION

### A. Standards for Summary Judgment

The standards applicable to motions for summary judgment are well-settled. A court may grant summary judgment only where there is no genuine issue of material fact and the moving party is therefore entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, id. at 255, 106 S.Ct. 2505 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

Once the moving party meets its initial burden of production, the burden shifts to the nonmoving party to demonstrate that there exist genuine issues of material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586, 106 S.Ct. 1348. There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that party's favor. Anderson, 477 U.S. at 249, 106 S.Ct. 2505. As the Supreme Court stated in Anderson, "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50, 106 S.Ct. 2505 (citations omitted).

### B. Legal Principles Governing the Schaeffers' Negligent Security Claim

To establish a claim of negligence, a plaintiff must demonstrate (1) the existence of a duty owed to him or her by the defendant, (2) a breach of that duty, and (3) injury resulting from the breach. See Solomon v. City of New York, 66 N.Y.2d 1026, 499 N.Y.S.2d 392, 392, 489 N.E.2d 1294 (Ct.App.1985); Iannelli v. Powers, 114 A.D.2d 157, 498 N.Y.S.2d 377, 380 (2d Dep't), leave to appeal denied, 68 N.Y.2d 604, 506 N.Y.S.2d 1027, 497 N.E.2d 707 (Ct.App.1986). An owner or occupier of land has a legal duty to exercise reasonable care under the circumstances to maintain his or her premises in a reasonably safe condition. Kush v. City of Buffalo, 59 N.Y.2d 26, 462 N.Y.S.2d 831, 833, 449 N.E.2d 725 (Ct.App.1983); Basso v. Miller, 40 N.Y.2d 233, 386 N.Y.S.2d 564, 568, 352 N.E.2d 868 (Ct.App.1976). That duty includes taking minimal precautions to protect members of the public from reasonably foreseeable criminal acts of third parties. Evans v. 141 Condominium Corp., 685 N.Y.S.2d 191, 193 (1st Dep't 1999); Iannelli, 498 N.Y.S.2d at 380.

A possessor of real property is not an insurer of the safety of those who enter onto his premises, however, and to establish the existence of a duty on his or her part to take minimal protective measures, it must be shown "that he [or she] either knows or has reason to know from past experience 'that there is a likelihood of conduct on the part of third persons ... which is likely to endanger the safety of the visitor.'" *Iannelli*, 498 N.Y.S.2d at 380 (quoting *Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 429 N.Y.S.2d 606, 613, 407 N.E.2d 451 (Ct.App.1980)). Indeed, this is the case even where "there is an extensive history of criminal conduct on the premises." *Iannelli*, 498 N.Y.S.2d at 380.

The New York Court of Appeals has recognized that a history of criminal activity in and around the area in which the plaintiff is injured can give rise to a duty on the part of the owner or possessor of premises to take reasonable steps to minimize the danger to persons visiting the premises. *See Nallan*, 429 N.Y.S.2d at 613–14, 407 N.E.2d 451; *see also Maysonet v. KFC, Nat'l Management Co.*, 906 F.2d 929, 931 (2d Cir.1990). Moreover, there is no requirement that the prior criminal activity relied upon to establish foreseeability be "at the exact location where plaintiff was harmed or that it be of the same type of criminal conduct to which plaintiff was subjected." *Jacqueline S. v. City of New York*, 81 N.Y.2d 288, 598 N.Y.S.2d 160, 163, 614 N.E.2d 723 (Ct.App. 1993). Rather, where there is evidence that the possessor of land has knowledge of prior criminal activities on his or her premises, whether such knowledge "is sufficient to make an injury to a plaintiff foreseeable to an owner or possessor of land 'must depend on the location, nature and extent of those previous criminal activities and their similarity, proximity or other relationship to the crime in question.'" *Lauersdorf v. Supermarket Gen. Corp.*, 239 A.D.2d 319, 657 N.Y.S.2d 732, 733 (2d Dep't 1997) (quoting *Jacqueline S.*, 598 N.Y.S.2d at 163, 614 N.E.2d 723).

Once a plaintiff establishes that a duty exists, he or she must then demonstrate that the defendant breached that duty by failing to provide minimal precautions against the foreseeable criminal acts of third parties, and that the breach was a proximate cause of his or her injuries. *See Burgos v. Aqueduct Realty Corp.*, 92 N.Y.2d 544, 684 N.Y.S.2d 139, 140, 706 N.E.2d 1163 (Ct.App.1998). In premises security cases, "[t]he question of what safety precautions may reasonably be required of the possessor of realty is generally a question of fact to be determined by the jury, taking into account such factors as, *inter alia*, the seriousness of the risk, the severity of the potential injuries and the cost or burden imposed on the possessor by reason of each such precautionary measure." *Iannelli*, 498 N.Y.S.2d at 381–82; *accord Nallan*, 429 N.Y.S.2d at 614 n. 8, 407 N.E.2d 451.

With respect to proximate cause, it is the plaintiff's burden to show that the defendant's conduct "was a substantial causative factor in the sequence of events that led to [the] injury." *Nallan*, 429 N.Y.S.2d at 614, 407 N.E.2d 451. "[T]he fact that the 'instrumentality' which produced the injury was the criminal conduct of a third person would not preclude a finding of 'proximate cause' if the intervening agency was itself a foreseeable hazard." *Id.*

## C. Application

Resolving all ambiguities and drawing all inferences in favor of the Schaeffers, I conclude that a reasonable jury could find that the management of Vera Wang knew or had reason to know that there was a likelihood of conduct on the part of third persons that was likely to endanger the safety of its customers, thus triggering a duty on the part of Vera Wang to take minimal precautions to protect its customers from reasonably foreseeable criminal acts of third parties.

The absence of prior criminal incidents on the premises of Vera Wang is strong evidence, of course, that an armed robbery was not reasonably foreseeable. *Cf. Iannelli*, 498 N.Y.S.2d at 381 ("[T]he record in the case at bar contains little evidence of criminal activity prior to the date of the shooting.... Under these circumstances, the evidence failed to establish that [defendants] could have reasonably foreseen the robbery and ensuing homicide, so as to give rise to a corresponding duty on their part to adopt security measures."). Likewise, the fact that Vera Wang is a high-end wedding gown shop (rather than a cash business) is strong evidence that the criminal acts in question were not foreseeable, for a high-end wedding gown shop in general is not a likely target for an armed robbery.

These facts, however, are not determinative. *Cf. Maysonet*, 906 F.2d at 931 ("In light of the absence of prior criminal incidents or assaults on the premises of the restaurant in this case, the district court properly concluded that the history of the premises could not give rise to a duty of care to protect patrons from criminal attacks.... Inquiry does not end[, however,] because the premises had been free of prior crimes."). Rather, the Court must determine whether the record contains sufficient other evidence to permit a reasonable jury to find that Vera Wang should have foreseen the robbery. I conclude that the record does contain sufficient such evidence, including:

— The March 23, 1994 robbery at Vera Wang was the eighth in a string of nine robberies on the Upper East Side in a three-year period perpetrated by well-dressed men where the victim was an older, well-to-do woman wearing a large diamond ring;

— The robberies were highly publicized, and were the subject of numerous newspaper and television news reports;

— The Hotel security staff posted some of the articles and circulated a "WANTED" poster to the shops at the Hotel, including Vera Wang;

— The Hotel security staff specifically discussed the robberies with Vera Wang employees, and specifically cautioned them to "keep an eye out" and not to let anyone into the store who looked "suspicious";[4]

— One Vera Wang sales assistant conceded that she had seen a newspaper article and a police sketch at the shop in December 1993, and Vera Wang's controller also acknowledged having read about the robberies;

— Vera Wang had installed a buzzer system to control access to the premises as well as an alarm system with a panic button underneath the reception desk; and

— Other crimes had been perpetrated in the vicinity of Vera Wang, including within the hotel.

A reasonable jury could find on the basis of this evidence that Vera Wang had reason to know that, even though it had not been robbed in the past, there was a likelihood that its customers could be endangered by the criminal acts of others. Indeed, a reasonable jury could find that Vera Wang knew about the rash of robberies and was specifically warned to be alert to such a possible robbery. Vera Wang also knew that its customers included individuals who fell within the general description of the victims in the recent rash of robberies. Accordingly, a reasonable jury could find that Vera Wang owed a duty to its customers to exercise reasonable care to maintain the premises in a reasonably safe condition. Finally, a reasonable jury could find that the Vera Wang receptionist should have foreseen a problem (and taken measures to avert it) shortly after Caggiano and Sebok entered the shop because of their suspicious behavior.

---

4. Although the Vera Wang employees denied having seen the poster and disclaimed any knowledge of the robberies, for purposes of this motion I must resolve the conflict in the testimony in favor of the Schaeffers.

Genuine issues of fact also exist as to whether Vera Wang breached its duty of due care. Vera Wang had a buzzer system (which might not have been working properly in any event), but no intercom. The Schaeffers' security experts, Brill and O'Rourke, contend that a buzzer system is more effective with an intercom, as the ability to speak permits the receptionist to speak with a prospective visitor before permitting the visitor to enter. The Schaeffers' security experts also estimate that an intercom would have cost only several hundred dollars to install.

A reasonable jury could also find that Vera Wang was negligent based on the events occurring after Caggiano and Sebok gained access to the premises. They did not look like they belonged. They acted in a suspicious manner. They changed their stories and said things that did not make sense. Moreover, although they were in the shop for a few minutes before they pulled out their guns, the receptionist waited before she took action by trying, unsuccessfully, to hit the panic button. One of the robbers saw her trying to use her hand to hit the button and he was therefore able to stop her. A reasonable jury could find that the receptionist mishandled the situation, that she did not respond quickly enough, that she should have used her knee rather than her hand to hit the panic button, and that Vera Wang had failed to properly train her in these respects. Indeed, the record contains evidence to show that Vera Wang had given the receptionist no instructions as to whom to let in or not let in, how to recognize security problems, how to respond in the event of a problem, or how to use the panic button.

Finally, a reasonable jury could find that any alleged failure of Vera Wang to provide minimal security measures was "a substantial causative factor in the sequence of events" that led to the Schaeffers' injuries. *See Nallan,* 429 N.Y.S.2d at 614, 407 N.E.2d 451. Brill, one of the Schaeffers' security experts, interviewed Caggiano, twice. Based on those interviews and his review of the record, Brill contends that Caggiano would have been

denied access if there had been an intercom and if a properly-trained receptionist—who had been made aware of the rash of robberies—had asked the right questions and responded in a proper manner. Indeed, Caggiano purportedly told Brill that "he probably would not have attempted entry if there had been an intercom at the door." (Brill Decl. ¶ 8). If a jury were to accept these facts, it could reasonably find that, if Vera Wang had spent a few hundred dollars to install an intercom and had properly trained its receptionist to screen visitors, Caggiano and his cohort would have either been turned away or left voluntarily.

In sum, the Schaeffers raise genuine issues of material fact with respect to each element of their negligence claims. Accordingly, Vera Wang's motion for summary judgment must be denied.

### CONCLUSION

For the foregoing reasons, Vera Wang's motion for summary judgment is denied. The parties shall appear for a pretrial conference on September 23, 1999 at 11:00 a.m. in Courtroom 11A at 500 Pearl Street, New York, New York.

SO ORDERED.