John **ELSROTH** as Administrator of the Estate of Diane Elsroth, Plaintiff,

v.

**JOHNSON & JOHNSON; McNeil Consumer Products Co., a division of McNeilab, Inc., and the Great Atlantic & Pacific Tea Co., Inc., Defendants.**

No. 87 Civ. 1524 (GLG).

United States District Court, S.D. New York.

Nov. 15, 1988.

---

J. Russell Clune, P.C., Harrison, N.Y. by J. Russell Clune, Kevin P. Clune, for plaintiff.

Lester Schwab Katz & Dwyer, New York City by Allan Fudim, Barry E. Warhit, for defendant The Great Atlantic & Pacific Tea Co., Inc.

Patterson, Belknap, Webb & Tyler, New York City by David F. Dobbins, Steven C. Charen, Frederick B. Campbell, for defendant McNeilab, Inc.

## OPINION

GOETTEL, District Judge:

With the California Supreme Court's decision in *Greenman v. Yuba Power Products*, 59 Cal.2d 57, 27 Cal.Rptr. 697, 377 P.2d 897 (1963), this country embarked down the largely uncharted road of strict products liability—a road whose twists and turns are still being mapped by our legislatures and courts. Today's case represents another signpost along that journey. It presents certain unique and difficult questions regarding the extent to which society is prepared to hold manufacturers and retailers liable for product tampering by third parties (in this case, unknown third parties). Before turning to the facts, some background is in order.

In late September of 1982, this country was shocked by a series of murders in the Chicago area stemming from cyanide tampering of Extra–Strength Tylenol capsules.[1] In swift response to those tragedies, the pharmaceutical industry, in concert with the Federal Government, moved to protect consumers from the perils and random madness of product tampering.

On November 5, 1982, barely one month after the Chicago tragedies were made public, the Food and Drug Administration (the "FDA") issued a final rule on tamper-resistant packaging applicable to most over-the-counter drugs, such as Tylenol.[2] As a result of that rule, manufacturers of over-the-counter drugs (with certain limited exceptions) were given a timetable in which to take steps to improve product integrity

by virtue of a tamper-resistant package.[3] The rule defines a "tamper-resistant package" as "one having an indicator or barrier to entry which, if breached or missing, can reasonably be expected to provide visible evidence to consumers that tampering has occurred." 21 C.F.R. § 211.132 (1987). As the FDA's comments attending issuance of the rule made clear, the rule allowed manufacturers flexibility in determining the most appropriate of several packaging options available (including various types of wrappers and seals listed by the FDA, although it made clear the list was by no means exhaustive or preclusive). 47 Fed. Reg. 50,442, 50,444 (Nov. 5, 1982).

Following issuance of the rule, the makers of Tylenol have marketed that product in tamper-resistant packaging with the following features: (1) a foil seal glued to the mouth of the container or bottle; (2) a "shrink seal" around the neck and cap of the container; and (3) a sealed box (the end flaps of which are glued shut) in which the product and container are placed. It appears that by 1986, after a considerable period of market losses Tylenol had incredibly regained its dominant position in the market for over-the-counter pain relievers. McFadden, *Maker of Tylenol Discontinuing All Over–Counter Drug Capsules*, N.Y. Times, Feb. 18, 1986, at A1, col. 3.

Against that backdrop, we turn to the facts underlying the present action, about which there are no material disputes.

## I. FACTS

On February 4, 1986, Harriet Notarnicola purchased a box of Extra–Strength Tylenol capsules from a Bronxville grocery store owned and operated by the defendant The

---

**1.** Tylenol is the manufacturer's brand name. The active chemical is acetaminophen. .

**2.** Consistent with its authority under the Administrative Procedure Act, 5 U.S.C. § 553(b)(B) (1982), the FDA dispensed with notice and hearing on the rule given the immediacy of the threat to the public safety. 47 Fed.Reg. 50,442, 50,488–489 (Nov. 5, 1982).

**3.** Those products considered the most susceptible to tampering, including two-piece gelatin

capsules such as the capsules involved in the present case, were given until February 7, 1983 to comply. Tablets and suppositories, considered less susceptible to tampering, were required to be in compliance by March 5, 1983. By February 6, 1984, it was required that any over-the-counter drug product appearing for sale in a retail store and subject to these regulations must be in compliance. 21 C.F.R. § 211.132(g) (1987); 47 Fed.Reg. 50,442, 50,446 (Nov. 5, 1982).

Great Atlantic & Pacific Tea Co. ("A & P"). During her deposition, Mrs. Notarnicola testified that the package did not appear out of the ordinary in any way; *i.e.*, it was not apparent to her that there had been any product tampering. When she returned home, she placed the unopened box in her food closet.

The decedent, Diane Elsroth, was that week visiting her boyfriend, Michael Notarnicola, at the home of Michael's parents. Late on the night of February 7, Diane complained of a headache. Michael went to the kitchen, opened the box and plastic container of Extra–Strength Tylenol purchased by his mother earlier that week, and returned with two capsules and a glass of water for Diane. At his deposition, Michael testified that he noticed nothing unusual about the packaging; *i.e.*, the flaps to the box were glued shut, the shrink seal did not appear to be disturbed, and the foil seal further securing the capsules had not been broken.

A short time after ingesting the capsules, Diane retired, mentioning that she was not feeling well. Her dead body was found the next day. The medical examiner concluded that the Tylenol capsules she ingested were contaminated by a lethal dose of potassium cyanide. Her death was listed as a homicide.

The murder remains unsolved, and it has not been determined conclusively how the product was tampered with. There is no genuine dispute, however, as to a crucial, material fact—the tampering in question occurred after the product left the manufacturer's control. Consistent with the FDA's conclusions as to the Chicago incidents in 1982, and the investigation of the Federal Bureau of Investigation in the instant case, the most likely scenario appears to be as follows. An unknown third party purchased or stole the Extra–Strength Tylenol in question at the Bronxville A & P, or at some other location. That individual breached the packaging, and substituted cyanide for some of the medicine contained in several of the gelatin capsules.[4] The individual replaced the now-contaminated capsules in the container and somehow was able to reseal the container and box in such a way that the tampering was not readily detectable. That individual then placed the contaminated box of Extra–Strength Tylenol on the shelf of the Bronxville A & P, where it was purchased on February 4 by Mrs. Notarnicola.[5]

Against this factual backdrop, John Elsroth, administrator of Diane Elsroth's estate, brings this action seeking to hold liable A & P and McNeil Consumer Products Co., a division of McNeilab, Inc. ("McNeil"), the manufacturer of Extra–Strength Tylenol.[6] Plaintiff seeks $1 million in compensatory damages on any one of three alternative grounds: strict products liability, breach of warranty, or negligence. He also seeks $92 million in punitive damages based on the allegedly outrageous conduct

---

4. For purposes of clarification, the product in question was Tylenol *capsules.* These capsules are comprised of a granule form of the medicine which is enclosed in a two-piece gelatin shell. This is distinguished from the solid form of the product, which comes in solid tablets or caplets, the latter shaped in capsule-like form. It appears that capsules are preferred by a certain percentage of consumers, primarily for two reasons: (1) although the strength of the various forms of Tylenol does not differ, some perceive *capsules to be stronger than other forms;* and (2) the capsule is considered by some to be easier to swallow, a characteristic caplets were designed to try to duplicate. The makers of Tylenol are now marketing a new form of the medicine called "gelcaps." Gelcaps are caplets coated with a thin gelatin shell. Again, the purpose of this innovation seems to be to try to duplicate, as closely as possible, the capsule form.

5. This conclusion is amply supported by the circumstantial evidence. In its investigation immediately following Diane Elsroth's death, the FDA found a second contaminated bottle of Extra–Strength Tylenol capsules in an F.W. Woolworth store also in Bronxville. This was the only other contaminated product discovered during the investigation. The two contaminated bottles were from different batches of Tylenol and were manufactured in different places at different times. No other product from either of the batches in question was found to be contaminated.

6. McNeilab, Inc. is a wholly owned subsidiary of Johnson & Johnson. All claims against Johnson & Johnson, originally a party defendant, were dismissed pursuant to stipulation of the parties, which was so ordered by this court.

of the defendants, and $500,000 for medical, funeral, and other expenses sustained by the estate as well as for pecuniary losses sustained by the decedent's next-of-kin.

The suit originally was brought in New York State court, but was removed to this court on petition of defendant A & P on the basis of diversity. Our jurisdiction is pursuant to 28 U.S.C. § 1332(a) (1982).

The defendants move for summary judgment on all claims. Plaintiff moves for summary judgment on certain claims asserted solely against A & P, and contends that fact questions preclude summary judgment on all remaining claims.

We are mindful that, although recent Supreme Court decisions have revitalized the use of summary judgment, Rule 56 remains a disfavored remedy in this circuit. Moreover, we are aware of this circuit's preference for ruling on difficult legal issues only upon a full evidentiary record. In this instance, however, we have resolved all disputed factual issues in the plaintiff's favor, as we suspect a sympathetic jury would do. To take this matter to trial and then set aside a jury's verdict as a matter of law would seem less desirable than ruling on these legal issues as presented by the motion papers. Thus, for the reasons that follow, we grant defendants' motions for summary judgment and deny plaintiff's motion for same.

## II. DISCUSSION [7]

### A. A & P's Alleged Negligence

We consider first the negligence claim asserted against A & P. Plaintiff contends that, as a result of the Chicago tampering cases in 1982, A & P was on notice that Tylenol could be the target of tampering. Consequently, it is argued, A & P's decision to continue to make Tylenol available as an over-the-counter drug where it would be susceptible to foreseeable tampering constituted a breach of A & P's duty to its customers. Since, plaintiff concludes, this breach was the proximate cause of Diane Elsroth's death, A & P is liable to plaintiff

in negligence. We think this reasoning rests upon a faulty premise, and we grant A & P's motion for summary judgment on the claim.

We begin with the well-traveled proposition that negligence is conditioned on the existence of a duty; without the latter, the former is nothing but an ethereal concept that cannot impart liability. This principle is neatly summarized in the oft-quoted maxim that "negligence in the air, so to speak, will not do." Pollock, Law of Torts 468 (13th ed. 1929).

The concept of duty as a limitation on tortious liability is somewhat unique to the American system, and it has received its share of criticism. W. Prosser, Handbook of the Law of Torts § 53, at 325 (4th ed. 1971) [hereinafter "Prosser"]. Its place in the law of this State, however, was firmly and forever established by the timeless opinion of then Chief Judge Cardozo in *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342, 162 N.E. 99, *reh'g denied*, 249 N.Y. 511, 164 N.E. 564 (1928):

> "In every instance, before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which would have averted or avoided the injury" (McSherry, C.J., in *W. Va. Central R. Co. v. State*, 96 Md. 652, 666 [54 A. 669]; ...). "The ideas of negligence and duty [,therefore,] are strictly correlative" (Bowen, L.J., in *Thomas v. Quartermaine*, 18 Q.B.D. 685, 694).

The question here presented is not whether retailers owe their customers certain duties, the breach of which may impart liability, for surely such duties exist. Duties arise from the relationship between parties, and most assuredly the retailer-patron relationship triggers the existence of certain duties. *Cf. Nallan v. Helmsley–Spear, Inc.*, 50 N.Y.2d 507, 518–20, 429 N.Y.S.2d 606, 613–14, 407 N.E.2d 451, 457–58 (1980) (holding owner of office building had duty to provide reasonable security for visiting public given history of criminal ac-

---

7. As a preliminary matter, we note that no choice-of-law questions are presented. The parties agree that New York law controls the legal issues in this case.

tivity in parts of the building). Rather, the task before us is one of marking delimits on the scope of whatever duties are owed as a result of the retailer-patron relationship. We hold that preventing acts of tampering off the merchant's premises by an unknown third party does not fall within the ambit of duties owed by a retailer to his or her customers.

■ Duty, as a term of art in the law of torts, is not easily defined. It is bound up with notions of public policy and the realities of everyday life; it is, in essence, a tool by which society places controllable limits on actions and inactions for which parties may be answerable in damages. *Waters v. New York City Housing Auth.*, 69 N.Y.2d 225, 229, 513 N.Y.S.2d 356, 358, 505 N.E.2d 922, 923–24 (1987). We may start from the proposition, however, that "duty, in negligence cases, [generally] may be defined as an obligation, to which the law will give recognition and effect, *to conform to a particular standard of conduct* toward another." Prosser § 53, at 324 (emphasis added). *Accord* Restatement (Second) of Torts § 4 (1965) ("The word 'duty' is used ... to denote the fact that the actor is required to conduct himself in a particular manner...."). Thus, the standard of conduct to which one must adhere "is the necessary complement of duty," Prosser § 37, at 206; duty and conduct "are correlative, and one cannot exist without the other." Prosser § 53, at 324.

Plaintiff here contends that defendant's breach stems from its decision to continue to make Tylenol available as an over-the-counter drug. Put differently, plaintiff contends that A & P was under a duty to treat Tylenol as akin to a prescription drug, *i.e.*, make Tylenol available only as a "behind-the-counter" drug. We cannot begin to imagine the havoc such a rule would wreak in the marketplace and the mischief it would engender.

Such a duty, once created, could not possibly be cabined. Any over-the-counter drug is just as surely susceptible of tampering as is Extra–Strength Tylenol. As the FDA concluded in 1982, "tamper-*proof* packaging is not possible." 47 Fed.Reg. 50,442, 50,444 (Nov. 5, 1982). It is true that in both the 1982 Chicago incidents and in the case at bar, Tylenol was the unlucky target. That does not mean that the crazed among us will in the future continue to limit the reach of their madness to such narrow confines. Anacin, Excedrin, or Bayer might just as easily be picked as the tools of terror. Indeed, it seems to us that the determined but less sophisticated tamperer might choose to disdain over-the-counter drugs entirely, given their tamper-resistant packaging, and choose instead an easier prey such as vegetables or fruits that are sold in open crates or boxes. The same could be said for virtually any product sold in today's supermarkets: cereals, meats, juices, dairy products—virtually anything.

In fashioning the duty propounded by plaintiff, would we not in fact be imposing a duty requiring that store owners place behind the counter all goods not thought to be impervious to tampering, making those goods available only through the assistance of store employees? Obviously, this "solution" is impractical in today's modern world. Imposition of such a duty might well solve the problem of product tampering, but only at the price of societal chaos. Consonant with "the court's traditional responsibility to fix the scope of duty, for application beyond a single incident, we need not blind ourselves to the obvious impact ... or societal consequences of rampant liability." *Strauss v. Belle Realty Co.*, 65 N.Y.2d 399, 405, 492 N.Y.S.2d 555, 559, 482 N.E.2d 34, 38 (1985).

In pegging the scope of a given duty, "not only logic and science, but policy play an important role" (*De Angelis v. Lutheran Med. Center*, 58 N.Y.2d 1053, 1055, 462 N.Y.S.2d 626, 449 N.E.2d 406 [1983]). The common law of torts is, at its foundation, a means of apportioning risks and allocating the burden of loss. While moral and logical judgments are significant components of the analysis, we are also bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that "the legal consequences of wrongs [are limit-

ed] to a controllable degree" (*Tobin v. Grossman*, 24 N.Y.2d 609, 619, 301 N.Y. S.2d 554, 249 N.E.2d 419 [1969] ...). *Waters*, 69 N.Y.2d at 229, 513 N.Y.S.2d at 358, 505 N.E.2d at 923–24 (citations omitted). *Accord Pulka v. Edelman*, 40 N.Y. 2d 781, 786, 390 N.Y.S.2d 393, 397, 358 N.E.2d 1019, 1023 (1976). Given the nightmarish consequences that would logically adhere were we to impose the duty suggested by plaintiff, we reject the concept. *Cf. Kimbar v. Estis*, 1 N.Y.2d 399, 405, 153 N.Y.S.2d 197, 201, 135 N.E.2d 708, 710 (1956) (holding campground had no duty to illuminate its woods to prevent injuries to campers walking at night given, in part, the utter impracticability of imposing this condition).

Moreover, we emphasize that we can conceive of no standard of conduct beyond that suggested by plaintiff that would permit imposition of a duty in this case. It might be said that A & P was under a duty to its patrons to reasonably secure the store—either through security personnel, video cameras, or a combination of both— and that such a duty *might* encompass deterring on-premises tampering. *Cf. Nallan*, 50 N.Y.2d at 520, 429 N.Y.S.2d at 613–14, 407 N.E.2d at 457–58 (finding owner of building under duty to place security guard in lobby to deter criminal conduct by unknown third parties). There is no evidence suggesting that such on-premises tampering occurred here. Indeed, as alluded to *supra*, the parties to this case concede that the sophisticated tampering involved here must have taken place *off* the A & P premises, with the contaminated product then returned to the store's shelves by the wrongdoer. Short of eliminating over-the-counter shopping, no practical, feasible, affordable way of ensuring

against this kind of tampering has been suggested by the parties or imagined by this court. As the New York Court of Appeals has opined, "Although it is reasonable to require one person to be responsible for the negligent conduct of another in some instances, it is unreasonable to impose that duty where the realities of every day experience show us that, regardless of the [reasonable] measures taken, there is little expectation that the one made responsible could prevent the negligent conduct." *Pulka*, 40 N.Y.2d at 785, 390 N.Y.S.2d at 396, 358 N.E.2d at 1022. Assuming some duty might arise requiring a retailer to inhibit certain forms of criminal conduct by others, there is simply no feasible way in which A & P could have prevented the kind of tampering that occurred here. To hold that A & P nonetheless had a duty in this regard is illogical, undermines sound notions of public policy, and contorts all concepts of justice.[8]

"The question of the scope of an alleged tort-feasor's duty is, in the first instance, a legal issue for the court to resolve." *Waters*, 69 N.Y.2d at 229, 513 N.Y.S.2d at 358, 505 N.E.2d at 923. *Accord* Restatement (Second) of Torts § 285, comment f, at 22 (1965); Prosser § 37, at 207. Although harm there was, defendant A & P owed the deceased no duty of the sort here suggested and, "[i]n the absence of duty, there is no breach and without a breach there is no liability." *Pulka*, 40 N.Y.2d 781, 782, 390 N.Y.S.2d 393, 395, 358 N.E.2d 1019, 1020 (citing *Kimbar*, 1 N.Y.2d at 405, 153 N.Y. S.2d at 201, 135 N.E.2d at 710).

Defendant A & P's motion for summary judgment on the negligence claim asserted against it is granted.

---

**8.** A & P relies principally on *Pulka* for the proposition that, for a duty to exist, it must be shown that the defendant had an opportunity to control the tortfeasor. *Pulka*, 40 N.Y.2d at 784, 390 N.Y.S.2d at 396, 358 N.E.2d at 1022. We have certain conceptual difficulties with the control aspect of the *Pulka* holding which, we note, served as grist for the dissent in that 4–3 decision. We need not and decline to rely on *Pulka*'s control rule as the basis for our decision today. The identity of the tamperer in this

case is unknown; however, even assuming that an A & P employee perpetrated the harm at issue, thereby bringing this case within the scope of the *Pulka* control rule, our decision today would be unaltered. The issue before us is not fairly stated as one of control but, rather, is one of prevention—could A & P have prevented the harm that occurred here, regardless of who perpetrated that harm. We think it obvious that it could not.

## B. Strict Products Liability

We consider next the core of plaintiff's complaint—the various claims sounding in strict products liability. Each of these claims is pleaded in the alternative: strict products liability, breach of warranty, and negligence. We think some pruning of the complaint would serve the interests of cogent analysis and, moreover, is mandated by a proper application of New York law.

First, we are of the view that plaintiff can recover nothing in negligence on his products claims that he cannot first recover under his strict liability claims asserting product, design, and warning defects.[9] Consequently, the products claims sounding in negligence will not receive separate consideration.

As to the warranty claims, they, too, will not receive individual attention. It appears, as plaintiff vigorously asserts, that by statutory quirk plaintiffs in New York products actions are allowed to plead alternatively in warranty and tort. *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 410–11, 488 N.Y.S.2d 132, 133–34, 477 N.E. 2d 434, 435–36 (1985). This fact, however, has no substantive effect on the case at bar. Consumer products claims in New York sounding in breach of warranty or strict liability in tort are substantively one and the same (certainly, at least as to those not in privity with the seller). *See, e.g., Heller*, 64 N.Y.2d at 411, 488 N.Y.S.2d at 134, 477 N.E.2d at 436 (noting that "there [was] no need [for the Legislature] to recognize an action on implied warranty for personal injuries" since New York had already recognized an equivalent action in strict products liability); *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 387, 384 N.Y.S.2d 115, 122, 348 N.E.2d 571, 578 (1976) (stating that, as to warranty claims asserted in a products action by those not in privity, "such a claim, based on tortious behavior[,] is more correctly treated under a theory of

strict products liability"); *Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 402, 373 N.Y.S.2d 39, 43, 335 N.E.2d 275, 278 (1975) (holding that "warranty," when used in the products liability context, sounds in and is equivalent to strict liability in tort); *Mendel v. Pittsburgh Plate Glass Co.*, 25 N.Y.2d 340, 305 N.Y.S.2d 490, 253 N.E.2d 207 (1969) (noting that "strict liability in tort and implied warranty in the absence of privity *are merely different ways of describing the very same cause of action* ..., [they involve] the *same cause of action,* with the *same elements of proof,* complaining of the *very same wrong*") (emphases added).

In sizing up the alternative pleading rule, one commentator has suggested that "the statute of limitations is the principal if not the sole element affected (warranty offers four years from sale as an alternative to the three years from injury applicable to strict products liability), [and thus] the plaintiff does no harm throwing warranty in as an extra count...." D. Siegel, Handbook on New York Practice § 37, at 13 (Supp.1987). We think a proper reading of the above-cited case law squarely supports this conclusion. Since no statute of limitations concerns are raised by this case, however, nothing of additional substance is added to the complaint by the alternative pleading. The warranty claims, therefore, will not further clutter our analysis.

We turn, then, to the heart of this case—the alleged marketing of a defective product for which the manufacturer and/or the retailer may be held accountable under a theory of strict products liability. As in most jurisdictions, a products claim in New York may be based on product, design, or warning defects. *Sage v. Fairchild–Swearingen Corp.*, 70 N.Y.2d 579, 585, 523 N.Y.S.2d 418, 421, 517 N.E.2d 1304, 1307 (1987). All three are asserted here, and we consider each in turn.

---

**9.** At oral argument, plaintiff's counsel indicated general agreement with this premise. It has been held that "theories of negligence and strict liability for design defect are, in New York, functionally equivalent." *DeRosa v. Remington Arms Co.*, 509 F.Supp. 762, 766 (E.D.N.Y.1981). The same has been said of warning defect claims asserted under negligence and strict liability. *Cooley v. Carter–Wallace, Inc.*, 102 A.D. 2d 642, 478 N.Y.S.2d 375, 379 (4th Dep't 1984). As for product defect, which is asserted only against A & P, whatever negligence claim might be asserted against A & P was treated *supra* section II.A.

## 1. Product Defect

Plaintiff first contends that A & P must be found liable on a product defect theory in that the product sold, Extra–Strength Tylenol capsules, left the seller's hands in "defective" condition laced with potassium cyanide. Since it is conceded the alleged "defect" occurred post-manufacture, plaintiff does not assert this claim against McNeil. He argues, however, that the retailer may be held strictly liable since it is engaged in the business of selling Tylenol and the Tylenol product it sold in this case was "defective." We disagree.

Retailers may be held liable under a theory of strict products liability. *Sukljian v. Charles Ross & Son Co.*, 69 N.Y.2d 89, 94, 511 N.Y.S.2d 821, 823, 503 N.E.2d 1358, 1360 (1986). New York's Court of Appeals, however, when alluding to product defect claims, repeatedly has suggested that such claims are predicated upon (and A & P argues *limited to*) flaws or mistakes in *"manufacturing." See, e.g., Sage,* 70 N.Y.2d at 585, 523 N.Y.S.2d at 421, 517 N.E.2d at 1307 ("manufacturing flaw"); *Sukljian,* 69 N.Y.2d at 94, 511 N.Y.S.2d at 823, 503 N.E.2d at 1360 ("manufacturing flaw"); *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 106, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204, 207 (1983) ("mistake in the manufacturing process"); *Robinson v. Reed–Prentice Div.,* 49 N.Y.2d 471, 478, 426 N.Y.S.2d 717, 720, 403 N.E.2d 440, 442 (1980) ("mistake in manufacturing"). A & P argues, therefore, that because the alleged "defect" in this case admittedly occurred post-manufacture, there can be no liability on a product defect theory. We are not convinced that, if squarely confronted with the question, the New York courts would take such a narrow view of what may constitute a product defect.

It has been stated that "by marketing the products as a regular part of their business [retailers] may be said to have assumed a special responsibility to the public, which has come to expect them to stand behind their goods." *Sukljian,* 69 N.Y.2d at 95, 511 N.Y.S.2d at 823, 503 N.E.2d at 1360. Springing from this notion of "standing behind" their products, and by analogy to cases holding manufacturers liable for manufacturing defects, we think that the New York courts would recognize a product defect claim if it could be shown that the *retailer* had made changes to the product at some time during the *retail* process, thereby causing it to be sold in a defective condition. *See Kotiadis v. Gristede Bros., Inc.,* 20 A.D.2d 689, 246 N.Y.S. 2d 662, 665 (1st Dep't 1964) (per curiam) (holding that manufacturer would not automatically be liable on breach of warranty theory asserted against retailer, the clear implication being that the defect might have resulted solely from mishandling at the retail and not the manufacturing level); Restatement (Second) of Torts § 402A comment g, at 351 (1965) (noting that defective condition defined "at the time [the product] leaves the seller's hands"). However, just as liability is limited to defects attributable to the manufacturer as part of the manufacturing process, so would liability be limited to defects attributable to the retailer as part of the retail process.

This case is far outside the confines of that rule. There is no evidence here that the retailer poisoned or otherwise altered the product. Instead, as outlined *supra,* this case concerns product tampering by an unknown third party. It appears that individual(s) bought or pilfered the product (either from this A & P or from another store), removed it from the premises, tampered with it, and then placed the contaminated product on A & P's shelves. Although this tampering obviously caused the product to be in an unreasonably dangerous condition when it left the retailer's hands for the second time, that condition cannot be attributed to the retailer on a product defect theory. It is attributable solely to the criminal intervention of a third party outside the ordinary parameters of the retail process.

To hold otherwise in this case would be a perversion of the justification partly underpinning the law of strict products liability, to wit, that manufacturers and retailers are in the best positions to shoulder the costs of products liability as a cost of doing business. *Sukljian,* 69 N.Y.2d at 95, 511 N.Y.S.2d at 823, 503 N.E.2d at 1360; *Co-*

*dling v. Paglia*, 32 N.Y.2d 330, 341, 345 N.Y.S.2d 461, 468–69, 298 N.E.2d 622, 627–28 (1973); Restatement (Second) of Torts § 402A comment c, at 350 (1965). If plaintiff's claim sounding in product defect were allowed to stand, retailers would be forced to underwrite the costs of criminal conduct outside the scope of the manufacture-retail process as a cost of doing business, a result far removed from the origins of this doctrine and without justification under any sound notion of public policy. A & P's motion on the product defect claim must be granted.

■ We note parenthetically that plaintiff most vigorously asserts the alternative theory of breach of warranty on this claim protesting that it will afford a remedy where strict liability in tort might fail. The charge, in essence, is that even if there exists no manufacturing or retail "defect" as such, the retailer breached an implied warranty of merchantability that the product was safe for consumption. *See* N.Y.U. C.C. § 2–314(2)(c) (McKinney 1964) (stating that implied warranty of merchantability includes warranty that goods sold are fit for their ordinary use).

As to that contention, we reiterate our earlier conclusion that warranty and tort claims in consumer products cases are simply two sides of the same coin, and we reject plaintiff's invitation here, under the guise of "warranty," to expand the doctrine of strict products liability beyond any cognizable bounds. Strict liability is not *absolute* liability. Plaintiff's warranty claim, however, if adopted, would create that very effect by rendering retailers absolute guarantors of the products they sell. Retailers, however, are not insurers—they are retailers. It is the concept of "defect," as that term of art is described in the law, that limits liability and distinguishes this tort from insurance concepts. Obviously this product was not fit for its intended use, but that lack of fitness was not attributable to a manufacturing or retail defect, as it must be. Without defect, there is no liability, and this is so whether the products claim is asserted in tort or under warranty principles. *See Rosado v. Proctor &*

*Schwartz, Inc.*, 66 N.Y.2d 21, 25–26, 494 N.Y.S.2d 851, 854, 484 N.E.2d 1354, 1357 (1985) (holding "strict products liability action is not analogous to vicarious liability, resulting in the imposition of liability without regard to fault"; seller of product will be held liable only if "the product was *defective* when it left [the seller's] hands") (emphasis added); *Martin v. Julius Dierck Equip. Co.*, 43 N.Y.2d 583, 596, 403 N.Y.S. 2d 185, 192, 374 N.E.2d 97, 104 (1978) (Gabrielli, J., dissenting) (noting that "[r]egardless of the nature of damages sought to be recovered, [be they in tort or in warranty,] the basis for liability is the sale of a *defective* product") (emphasis added). Consequently, plaintiff's suggestion that A & P may be held liable here for a breach of its implied warranty of merchantability, without regard to whether the product was defective, is rejected.

For all of these reasons, A & P's motion for summary judgment on the product defect claim is granted.

## 2. Design Defect

Plaintiff contends that both defendants are liable on either of two design defect claims: (a) that the packaging used for Extra–Strength Tylenol capsules is defectively designed in that it is not sufficiently tamper-resistant; and (b) the product here at issue—gelatin capsules—suffers from a design defect in that it is more susceptible to tampering than other forms of the medicine (such as tablets or caplets). We think neither passes muster, and we grant defendants' motions for summary judgment on the design defect claims.

### (a) The Packaging

■ Plaintiff contends that the packaging used in this case obviously was not tamper-resistant enough, which plaintiff attributes to a design defect. He highlights the fact that no evidence was left of the tampering which, in plaintiff's mind, underscores the defect. *See* 21 C.F.R. § 211.132(b) (1987) (packaging, if breached, should "reasonably be expected to provide visible evidence to consumers that tamper-

ing has occurred").[10]  This claim must fail as a matter of law.

In determining whether a particular design is defective, the question is "whether the product as designed was 'not reasonably safe'—that is, whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 402, 450 N.E.2d 204, 208 (1983).  Although this is typically a factual question for the jury, we think it beyond peradventure that any reasonable person would conclude that the utility of this product (pain relievers) is outweighed by the isolated risks inherent in marketing the product in the tamper-resistant packaging here at issue.

As to the harm, McNeil, through its research, knew that this packaging could be violated by a determined tamperer using sophisticated means, and that no evidence of this kind of sophisticated tampering would be visible to the average consumer. As one McNeil official put it, tampering by "the Rembrandt kind of criminals, the guys that are going to this exotic kind of technology," could not be prevented by this kind of packaging.  Larsen Dep., at 60.

McNeil was also operating under the constraint, however, as recognized by the FDA when it drafted the 1982 regulations, that *no* packaging could prevent this kind of "exotic" tampering—"tamper-*proof* packaging is not possible."  47 Fed.Reg. 50,442, 50,444 (Nov. 5, 1982).  We think this conclusion is a crucial part of the legal calculus to be employed here in determining if a "defect" existed, and we take judicial notice of the FDA's assessment of the state of existing technology.  *See* 44 U.S.C. § 1507 (1982) (permitting court to take judicial notice of the Federal Register's contents, a course we deem particularly prudent when, as here, no contrary evidence has been submitted to the court).[11]

We begin, therefore, with an isolated risk of determined, sophisticated tampering, but with no reasonable means available to McNeil to ensure that its product would be impervious to that risk.  Balanced against those concerns is the undisputed utility of this product, a non-aspirin pain reliever, as reflected by its prodigious sales.

The packaging alternative ultimately designed by McNeil employed not one, not two, but three of the tamper-resistant features listed as alternatives in the 1982 FDA regulations.  *See* 47 Fed.Reg. 50,442, 50,-444 (Nov. 5, 1982) (listing various packaging alternatives).  Although the FDA noted that use of any one option listed might not by itself constitute compliance for a given product line, *id.* at 50,445, we think it beyond cavil that the three combined methods employed by McNeil met the FDA's requirement that the packaging, if breached, *"can reasonably be expected* to provide visible evidence to consumers that tampering has occurred."  *Id.* at 50,444 (emphasis added).  Evidence of compliance with Government regulations is, we believe, pertinent to a utility/risk analysis under *Voss. Cf. Cover v. Cohen,* 61 N.Y.2d 261, 276, 473 N.Y.S.2d 378, 386, 461 N.E.2d 864, 871 (1984) (holding that such compliance is relevant to determining whether a provided warning was defective).[12]

When all of these factors are thrown into the mix, we find, as a matter of law, that under a utility/risk analysis this packaging was in a condition "reasonably contemplated by the ultimate consumer" and was

---

10.  The FBI concluded that the tampering that occurred here could be detected only by highly sophisticated means.  Bonner Decl., at 2.

11.  As discussed *supra* subsection II.A., we already have rejected as *per se* unreasonable the notion that the availability of this product over-the-counter should have been discontinued. Thus, that cannot be viewed as a reasonable distribution alternative.

12.  We add only that in choosing an appropriate packaging design, concerns beyond tampering rightfully occupied important roles in the decision-making process.  *See especially* 47 Fed.Reg. 50,442, 50,444 (Nov. 5, 1982) ("The [FDA] urges manufacturers and packagers, in designing the tamper-resistant packages, to take into consideration that such packaging should not be so difficult to open that arthritics and others manually impaired cannot open them.").

not "unreasonably dangerous for its intended use." *Robinson*, 49 N.Y.2d at 479, 426 N.Y.S.2d at 720, 403 N.E.2d at 442.

Further buttressing that conclusion, we note that it would be plaintiff's burden at trial on this claim "to present evidence that the [packaging], as designed, was not reasonably safe *because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner.*" *Voss*, 59 N.Y.2d at 109, 463 N.Y.S.2d at 402, 450 N.E.2d at 208 (emphasis added). As to the substantial likelihood of harm, we think the isolated incidents of this kind of crazed behavior, coupled with the current packaging that appears to be effective against all but the most sophisticated, determined tamperer, demonstrates a much slighter risk than is suggested. We don't say that tampering is impossible (obviously it is not), and we don't minimize its consequences, but whether it is substantially likely is another matter.

Moreover, plaintiff has presented no evidence of what other steps might feasibly have been taken to ensure a higher degree of safety. Plaintiff's counsel asserts that "[v]arious design alternatives were available that would have provided better protection against tampering." Clune Aff., at 6. Nowhere in the papers submitted on these motions, however, does counsel offer facts to support this assertion. No expert affidavit or documentary evidence is submitted. Plaintiff cannot simply rest on the pleadings, conjecture, and speculation and expect to survive this motion for summary judgment. Fed.R.Civ.P. 56(e); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1593, 20 L.Ed. 2d 569 *reh'g denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam). Proof of a safer, feasible design must be part of plaintiff's case in chief at trial, *Voss*, 59 N.Y.2d at 109, 463 N.Y.S.2d at 402, 450 N.E.2d at 208, and summary judgment is proper when, after discovery, a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

If defendants had simply glued shut the cardboard carton in which the product was contained, we could understand the argument. Those are not the facts, however. A foil seal and shrink seal also were employed. If there are better tamper-*resistant* features available that would be feasible for use here, plaintiff has not described them.

Certainly, if it is plaintiff's argument that other packaging options were available, the point must be conceded. McNeil could have used film wrappers (a transparent film wrapped securely around the container), bubble packs (the product and container are sealed in plastic and mounted on a display card), or breakable caps, to name a few. *See* 47 Fed.Reg. 50,442, 50,444 (Nov. 5, 1982) (outlining these and other options). We return, however, to the fundamental premise that none of the above methods are inherently superior to those chosen by McNeil, for *no* packaging can boast of being tamper-*proof. Id.* Had any of the above options been employed in this case, with the same tragic results, would not plaintiff be right back here with a virtually identical design defect claim?

This, it seems to us, reveals plaintiff's packaging claim for what it really is. Although masquerading as a claim for "better protection against tampering," it is, in reality, a claim for tamper-*proof* packaging. Unfortunately, no such packaging exists.

For all of these reasons, we reject as a matter of law the contention that the packaging was defective.

### (b) Gelatin Capsules

▋ Plaintiff also contends that the use of gelatin capsules constituted a design defect in that they are more susceptible to tampering than are solid forms of the product. Indeed, this conclusion was recognized by the FDA in promulgating the 1982 regulations. *See* 47 Fed.Reg. 50,442, 50,-446 (Nov. 5, 1982) (noting that "tablet and suppository dosage forms are considered less susceptible to tampering [than are cap-

sules]"). Since, it is argued, tampering with Tylenol was reasonably foreseeable in light of the 1982 Chicago incidents, and because a safer alternative was available (tablets or caplets), it is contended that the use of gelatin capsules falls within the design defect rule articulated in *Voss*, described *supra*. Although the gloss put on this claim gives it at least superficial appeal, we believe that, when placed in its proper context, this claim also must fail.

As a preliminary matter, we note that defendants focus much of their argument on *Robinson v. Reed–Prentice Div.*, 49 N.Y.2d 471, 426 N.Y.S.2d 717, 403 N.E.2d 440 (1980). We think that emphasis is misplaced. In *Robinson*, the plaintiff was injured by a plastic molding machine, the safety gate of which had been substantially altered by the purchaser (plaintiff's employer). In holding that the manufacturer was not liable on a design defect theory, the Court of Appeals held that "[s]ubstantial modifications of a product from its original condition by a third party which render a safe product defective are not the responsibility of the manufacturer," even if that alteration is foreseeable. *Robinson*, 49 N.Y.2d at 479–80, 426 N.Y.S.2d at 720–21, 403 N.E.2d at 442–43. *See also* Restatement (Second) of Torts § 402A comment h (1965) ("[A] product is not in a defective condition when it is safe for *normal* handling and consumption. If the injury results from *abnormal* handling ... the seller is not liable.") (emphases added). Defendants argue, in essence, that if the foreseeable, intentional acts of a third party in altering a safety gate cannot serve as a predicate for manufacturer liability, then certainly the arguably foreseeable, criminal acts of tampering by a third party cannot be a basis for liability in this case.

There is no dispute that gelatin capsules are safe for their normal, intended use; they become unreasonably dangerous only if affirmatively mishandled. Concededly, the mishandling in this case appears not to have been that of the purchaser, as it was in *Robinson*, but it just as certainly was not that of the manufacturer. Nonetheless, we think plaintiff's claim here runs

deeper, and *Robinson* does not entirely control.

When the machine in *Robinson* left the seller's hands, it had a safety gate. It was not defectively designed. Had that machine lacked a safety gate, however, an entirely different question would have been before the Court, and we think it a safe assumption that the Court would have found such a product defectively designed in accord with the *Voss* rule. The claim before us, in essence, is that the Tylenol was defectively designed when it left the seller's hands because it lacked a "safety gate," *i.e.*, caplets, because they are more difficult to tamper with, have a "safety gate" that capsules lack. Viewed in this light, this claim presents questions that may not be controlled by the *Robinson* alteration rule.

We think analogous precedent exists, however, and we find it in products cases involving small handguns or "Saturday Night Specials." The elements underpinning plaintiff's design defect theory here are also present in these handgun cases: (1) it certainly is foreseeable that these handguns will be misused for criminal purposes, and (2) they are more susceptible to such misuse than are other firearms, either because they are less expensive, more readily available, or more easily concealed. Design defect claims involving these products, however (which we emphasize have far less social utility than Extra–Strength Tylenol capsules), repeatedly have been rejected—either because the manufacturer owes no duty to design a product impervious to criminal misuse or because the design of these handguns is held reasonable as a matter of law. Based on either approach, plaintiff's claim fails here.

As to duty, we start with the general rule that under "ordinary circumstances" individuals are under no duty to anticipate and prevent criminal conduct by others. There are, of course, exceptions to this general proposition, the most common being if one's own affirmative act has created or exposed another to a high degree of risk of harm, or if the parties stand in a special relationship to one another (such as carrier-

passenger, innkeeper-guest, employer-employee, landowner-invitee, or bailor-bailee). Restatement (Second) of Torts § 302B comment e, at 90–93 (1965); Prosser § 33, at 173–76.

Plaintiff, pointing to the 1982 incidents and the greater susceptibility of capsules to tampering, suggests that the "special circumstances" justifying an exception to the general rule are present here. In positing that a further erosion of the traditional rule was not warranted in handgun cases, however, despite the existence of similar "special circumstances," one of this country's preeminent jurists concluded, " '[E]veryone has a right to rely upon his fellow-men acting lawfully.... There may have been some nibbling at the edges of this rule ... but the rule hardly will be disputed.' " *Mavilia v. Stoeger Indus.*, 574 F.Supp. 107, 110 n. 3 (D.Mass.1983) (quoting O.W. Holmes, Collected Legal Papers 131–32 (1952)). Springing from this reasoning, at least one court has forthrightly concluded in a handgun products case that there exists "no duty upon a manufacturer of a nondefective product to anticipate the various unlawful acts possible through the misuse of that item." *Bennet v. Cincinnati Checker Cab Co.*, 353 F.Supp. 1206, 1210 (E.D.Ky.1973).

We likewise believe that the facts of this case are particularly ill-suited to justifying an exception to the criminal foreseeability rule. First, as noted by the FDA, although tablets and caplets are less susceptible to tampering, they are not tamper-*proof*— "known methods of tampering are [simply] more difficult to apply." 47 Fed.Reg. 50442, 50446 (Nov. 5, 1982). In addition, as emphasized *supra*, there exists no packaging that will render an over-the-counter drug tamper-*proof*, and the idea that products susceptible to tampering should not be sold over-the-counter is unreasonable *per se*. Thus, we are left with the reality that certain products are susceptible to criminal tampering, and this tampering can be limited but not prevented. The plaintiff cannot

demonstrate that had the manufacturer eliminated gelatin capsules these criminals (who apparently prefer Tylenol products) would not have poisoned tablets or caplets. Anyone capable of such sophisticated package tampering would have little difficulty in contaminating the product.

The notion that manufacturers should nonetheless be forced to write-off the consequences of determined, criminal tampering by third parties as a cost of doing business would be an unprecedented extension of the common law. Automobile manufacturers are not liable to those burglarized when automobiles are used to effectuate burglaries; telephone companies are not liable to those defrauded when the telephone lines are used to perpetrate fraudulent schemes; and handgun manufacturers are not liable to those injured when handguns are used to inflict criminal harm. *See especially Patterson v. Rohm Gesellschaft*, 608 F.Supp. 1206, 1213 (N.D.Tex. 1985) (holding that "ability of gun manufacturer to 'spread the loss' ... [thereby] requiring guiltless purchasers of guns to subsidize the actions of those who use firearms wrongfully" does not comport with tort notions of fairness).[13]

■■■ Thus, we believe there exists no common-law duty requiring drug manufacturers to design their products in such a way as to anticipate and frustrate criminal tampering.

Alternatively, even if it can be said that such a duty exists, we think that the marketing of gelatin capsules was not "unreasonably dangerous" as a matter of law. The gloss put on this claim is that capsules —a form of the medicine preferred by a certain percentage of consumers, *supra* note 4—are more susceptible to tampering than are tablets or caplets. But is the manufacturer of a high-speed automobile liable to a burglary victim because its car, which far exceeds any speed requirements of the road, makes it more likely that the burglar will be able to evade capture in

---

**13.** We add only that in spreading the loss here, whatever increased costs may be reflected in the price of the product may be especially harsh for the elderly and infirm to bear—many of whom are on fixed incomes and rely upon various types of over-the-counter pain relievers and medication.

making his or her getaway, whereas the manufacturer of a four-cylinder vehicle misused for the same purposes is not? Even more to the point, once again, are the products cases involving handguns.

Although all handguns are susceptible to criminal misuse, small handguns and "Saturday Night Specials," as highlighted earlier, are especially susceptible in this regard. Yet, products claims based on design-defect theories emphasizing these "special circumstances" consistently are rejected. *E.g., Moore v. R.G. Indus., Inc.*, 789 F.2d 1326, 1327 (9th Cir.1986); *Armijo v. Ex Cam, Inc.*, 656 F.Supp. 771, 775 (D.N.M.1987), *aff'd*, 843 F.2d 406, 407 (10th Cir.1988).[14] In particular, we point out three such cases which, in determining as a matter of law that the marketing of smaller handguns was not unreasonable, placed special emphasis on the legislature's failure to adopt legislation banning handguns of this nature. *See Rohm Gesellschaft*, 608 F.Supp. at 1214; *Mavilia*, 574 F.Supp. at 111; *Richman v. Charter Arms Corp.*, 571 F.Supp. 192, 198 (E.D.La.1983), *aff'd in relevant part*, 762 F.2d 1250, 1271–72 (5th Cir.1985) (each holding that legislature's refusal to ban handguns, in light of obvious awareness that these firearms can be misused, leads to "clear inference" that majority of legislators do not consider the manufacture of small handguns to be "unreasonably dangerous" or "socially unacceptable").

The *raison d'etre* of those cases is even more compelling here. The regulations promulgated by the FDA in 1982 recognized that gelatin capsules were more susceptible to tampering than solid forms of the medicine. Indeed, for that reason over-the-counter products sold in capsule form were required to be in compliance with the packaging and labeling requirements sooner than other forms of the product considered less susceptible to tampering. 47 Fed.Reg. 50,442, 50,446 (Nov. 5, 1982).

*The sale of gelatin capsules, however, was not banned by the FDA.* To the contrary, the FDA implicitly (if not expressly) concluded that the marketing of gelatin capsules was not unreasonable—*so long as such products were packaged in the proscribed tamper-resistant packaging with appropriate labeling.* That context, it seems to us, is crucial for a proper understanding of this claim. This claim cannot be viewed, as plaintiff suggests, as solely involving gelatin capsules. It involves gelatin capsules that are marketed in tamper-resistant packaging. If small handguns misused for criminal conduct—a far more common and foreseeable occurrence than product tampering—are not defectively designed, then gelatin capsules of Extra-Strength Tylenol cannot be said to be defectively designed—especially when those capsules are sold with a feature (state-of-the-art, tamper-resistant packaging) which minimizes the criminal risk.

Thus, we think this design defect claim fails for either of two reasons: McNeil had no duty to design a product that would be resistant to the kind of criminal tampering that took place here, or the marketing of gelatin capsules is not defective as a matter of law. The marketplace, of course, imposes its own obligations.[15] The doctrine of strict products liability, however, was not created as a lever to control the criminal conduct of persons over whom manufacturers and retailers have no control, and we will not allow it to be so used here. Defendants' motions on this claim, therefore, are granted.

### 3. Warning Defect

█ Under New York law, a manufacturer generally is under a duty to give reasonable and adequate warnings of product dangers about which the manufacturer is or should be aware. *Cover v. Cohen*, 61 N.Y.2d 261, 276, 473 N.Y.2d 378, 386, 461

**14.** The sole case to which we are referred that is to the contrary, *Kelley v. R.G. Indus., Inc.*, 304 Md. 124, 497 A.2d 1143 (1985), has been criticized in other decisions, including those cited above.

**15.** Indeed, we note that McNeil ceased marketing capsules after this incident in an effort to bolster consumer confidence. Many other drug manufacturers have followed suit. A recent walk through a local pharmacy, however, reveals that a number of drug and vitamin products are still sold in capsule form.

N.E.2d 864, 872 (1984); 1 New York Pattern Jury Instructions § 2:135 (2d ed. 1974 & Supp.1988). In this case, the product in question was labeled as being "SAFETY SEALED."[16] In addition, and consistent with FDA regulations, the cardboard container was labeled as follows: "WARNING: Do not use if carton is opened, or if printed red neck wrap or printed foil inner seal is broken." The plastic bottle contained a further admonition: "WARNING: Do not use if printed red neck wrap or printed inner seal is broken."

Plaintiff contends that, notwithstanding the above warnings, three types of warning defects are manifest in this case: (1) McNeil failed to advise consumers that the packaging was not tamper-proof; (2) McNeil failed to instruct consumers as to what to look for to determine if tampering may have occurred; and (3) McNeil failed to warn consumers that gelatin capsules were more susceptible to tampering than tablets or caplets. Defendants move for summary judgment on these claims, although the warning issues receive scant attention in their papers. Plaintiff contends that there exist issues of fact necessitating jury review.

As to the first two warning claims, we think that, even if it could be said that the warnings plaintiff seeks are reasonable (matters we need not decide), there are insuperable causation problems dooming these claims. It is, of course, part of plaintiff's *prima facie* burden in a typical tort case to demonstrate "that the defendant's negligence was a *substantial cause* of the events which produced the injury." *Derdiarian v. Felix Contracting Corp.*, 51 N.Y. 2d 308, 316, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (1980) (emphasis added). That burden remains though the tort sounds in strict products liability. *Voss*, 59

N.Y.2d at 110, 463 N.Y.S.2d at 403, 450 N.E.2d at 209. As to what constitutes "substantial cause," we are particularly mindful of Professor Prosser's observation that "no case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it." Prosser § 41, at 240. *Accord Iacurci v. Lummus Co.*, 340 F.2d 868, 872 (2d Cir.1965) (holding that warning defect will not impart liability "if the accident would have occurred absent [defendant's] negligence"), *vacated on other grounds*, 387 U.S. 86, 87 S.Ct. 1423, 18 L.Ed.2d 581 (1967). Further, "when the evidence as to the cause of the accident which injured plaintiff is undisputed, the question as to whether any act or omission of the defendant was a proximate cause thereof is one for the court and not the jury." *Rivera v. City of New York*, 11 N.Y.2d 856, 227 N.Y.S.2d 676, 677, 182 N.E.2d 284, 285 (1962).[17]

In our mind, there can be no dispute that the tragedy before us would have occurred even if McNeil had warned that the packaging used in this case was not tamper-proof. As we have emphasized, there is no such thing as tamper-proof packaging for over-the-counter drugs, and, moreover, plaintiff has presented no evidence suggesting that *safer* packaging could have been employed in this case. The absence of the warning urged by plaintiff, therefore, was immaterial. It is not as if the warning would have allowed the consumer to make a more informed "choice," for no choice was presented. *All* over-the-counter drugs suffer from the same inability to ensure a tamper-proof product. Simply put, this tragedy would have occurred whether or not there had been a warning that the packaging was not tamper-proof, and the claim, therefore, must fail.[18]

**16.** Plaintiff contends that the "SAFETY SEALED" label constituted an express warranty that was violated in this case because McNeil knew that its product was not impervious to tampering. We reject this claim outright. McNeil warranted that its product was "safety sealed," and it was. There was no warranty, either express or implied, that the product was tamper-proof.

**17.** New York's case law appears to treat questions of cause in fact and proximate cause under the single rubric of "proximate cause."

**18.** The only way this warning would be relevant to a causation analysis is if plaintiff could demonstrate that no over-the-counter pain reliever would have been bought in light of the warning that these products cannot be rendered impervi-

The same causation infirmity afflicts plaintiff's second claim. The warnings given instructed consumers not to use the product if any of the three tamper-resistant features had been breached. Plaintiff contends that this was inadequate since "McNeil knew [the seals] could be removed without being broken and should have instructed consumers as to what indicia would be produced by removal without breaking the seal." Clune Aff., at 9. On its face, this claim is absurd. As plaintiff's counsel concedes, the kind of sophisticated tampering at issue in this case occurs "without leaving any evidence of the tampering on the package that would be perceptible to the average consumer." *Id.* at 4. Thus, to the extent this claim involves the packaging, it is unreasonable as a matter of law since there is nothing that consumers could reasonably be instructed to look for to indicate tampering of this kind.

Plaintiff argues that this claim survives on different grounds, however. First, he urges that consumers should have been instructed to examine the capsules themselves. Indeed, the evidence suggests that cyanide, the poison used here, has a corrosive effect on gelatin capsules over time, so such an instruction (which was not part of the packaging) might have proved helpful. Second, McNeil failed to instruct consumers as to how to open the glued box in such a manner as to utilize its taper-resistant features. Michael Notarnicola testified at his deposition that he tore both flaps of the carton off at the same time, rather than separating them one at a time to examine each for "fiber tear." Plaintiff suggests that such an instruction was contemplated by the FDA when it required that packaging "be accompanied by appropriate illustrations or precautionary statements to describe the safeguarding mechanism to the consumer." 47 Fed.Reg. 50,442, 50,444 (Nov. 5, 1982).

Even if the failure to provide such warnings could be said to constitute a defect, however, they are inapplicable here since the evidence before us, consistent with the investigations that were conducted, unequivocally demonstrates that there was no detectable indication of any kind of tampering in this case.[19] Thus, even if the product could be said to be defective in the absence of these warnings, that defect in no way was a substantial cause of Diane Elsroth's death. Put differently, the desired warnings would have had no affect on the prevention of this tragedy and, thus, were not a substantial cause of the events giving rise to liability.

Plaintiff's third warning claim presents different considerations. We held *supra* that gelatin capsules were not defectively designed or marketed. Plaintiff contends, however, that McNeil was under a duty to warn consumers, as revealed by its own research, that capsules are more susceptible to tampering than are tablets or caplets. Whether or not a particular product is more or less susceptible to criminal tampering is, it seems to us, beside the point. For this claim to survive, it must be bottomed on an alleged duty to warn of the potential criminal misuse of a product by outside forces. For the same policy reasons underlying our conclusion that manufacturers of over-the-counter drugs are under no common-law duty to design products that are more impervious to criminal misuse, we find that no common-law duty to warn of potential criminal misuses of a product arises. Plaintiff cites no case standing for that proposition, nor may we arrive at that point by way of analogy to any of the case law to which we are referred.

■ Manufacturers, of course, are under a duty to warn of the dangers that may be associated with the normal and lawful use of their products. A manufacturer need not warn that its product may be susceptible to criminal misuse, however, or even that certain of its products may be more susceptible to such tampering or the like than others. *Cf. Richman*, 571 F.Supp. at

---

ous to tampering. We reject any implicit notion to that effect.

**19.** At the time the product was used, the cyanide apparently had not been in the product long enough to cause any appreciable corrosion visible to the naked eye.

197 (holding that warnings accompanying snub-nose handgun explaining how the product may be criminally abused is unreasonable as a matter of law), *aff'd in relevant part,* 762 F.2d at 1270–72 (characterizing district court's conclusions on warning claim as "unassailable").

For all of these reasons, therefore, defendants' motions for summary judgment on the warning claims are granted.[20]

## C. Punitive Damages

Plaintiff seeks, in addition to compensatory damages, $92 million in punitive damages. It is patently obvious that the kind of willful or wanton disregard for public safety that must underpin a claim for punitive damages is not present here. Thus, even if it could be said that any of plaintiff's claims could withstand these motions, we hold separately that any claim for punitive damages in this case is dismissed.

### Conclusion

The emotions in this case are strong, making our decision today all the more difficult. Our task, however, is to serve as a dispassionate arbiter of the law, guided always by the legal principles that are its lifeblood while ever cognizant of the pillars that serve as its foundation: fairness, equity, and justice. An injustice has been done, but we think a second would be perpetrated were we to permit recovery against these defendants for a wrong they did not truly commit.

The doctrine of strict products liability is built upon those same supports of fairness and equity, oftentimes lumped together under the heading of "public policy." As recognized by the New York Court of Appeals:

> Imposition of strict liability against a manufacturer rests largely on public policy. The justification for it is that the seller, by marketing his product, has undertaken a special responsibility toward members of the consuming public who may be injured by it. The public has a right to expect that sellers will stand behind their goods. Thus, the burden of accidental injuries caused by products intended for consumption has been placed upon those who market them, to be treated as a cost of production because manufacturers are best able to protect against defective products and bear the cost if they fail.

*Sage v. Fairchild–Swearingen Corp.,* 70 N.Y.2d 579, 585, 523 N.Y.S.2d 418, 421, 517 N.E.2d 1304, 1307 (1987). When reduced to its essentials, it can be seen that this case involves none of these concerns. We do not have here a failure by the manufacturer and retailer to stand behind the goods they market; we do not have an accidental injury caused by goods they have placed in the stream of commerce. We instead are presented fundamentally with the proposition that manufacturers and retailers should be held liable in damages, as a cost of doing business, for the criminal conduct of unknown third parties who misuse the manufacturer's product in carrying out the misdeeds because the criminal cannot be held accountable. Notwithstanding the grievous harm here inflicted, we think such a result is not contemplated by the law, nor is it consonant with sound notions of fairness, equity, and justice.

Defendants' motions for summary judgment are granted, and all claims are dismissed. The clerk shall enter judgment accordingly.

SO ORDERED.

---

**20.** We add that defendants have also argued that plaintiff's claims, at least those for design and warning defects, are preempted by the 1982 FDA regulations. We, of course, need not reach that constitutional question, having determined that no common-law claims are sustainable in this case.